**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | | |
|---|---|---|---|
| LaSALLE NATIONAL BANK ASSOCIATION, | ) | | |
| f/k/a LaSalle National Bank, as Trustee | ) | | |
| for Certificate Holders of Assets | ) | | |
| Securitization Corporation, Commercial | ) | | |
| Pass-Through Certificates Series 1997, D5, | ) | | |
| | ) | | |
| Appellant, | ) | | |
| | ) | No. | 07 C 2722 |
| v. | ) | | 07 C 2815 |
| | ) | | 07 C 5231 |
| GUS A. PALOIAN, Chapter II Trustee of | ) | | 07 C 5232 |
| Doctors Hospital of Hyde Park, Inc., | ) | | |
| | ) | | |
| Appellee. | ) | | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

# TABLE OF CONTENTS

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.     The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.    History of Doctors Hospital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.   The Daiwa Loan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       A.     MMA Funding's Function as a Special Purpose Entity
              under the Daiwa Loan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

       B.     The Contribution of Doctors Hospital's Healthcare
              Receivables Under the Daiwa Loan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.    The HPCH Lease/Nomura Loan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

V.     Transfer of the Nomura Loan to the Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VI.    Cash Flow Under the Daiwa and Nomura Loans . . . . . . . . . . . . . . . . . . . . . . . . . . 17

       A.     Cash Flow Before the Nomura Loan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

       B.     Cash Flow After the Nomura Loan and Up to July 7, 1998 . . . . . . . . . . . . . . . 19

       C.     Cash Flow After July 7, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VII.   Doctors Hospital's Insolvency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

       A.     Expert Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

       B.     Other Evidence of Insolvency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

VIII.  Bankruptcy Court Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Summary of Issues On Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

I.     The Bankruptcy Court Did Not Clearly Err In Finding Defendant
       Was the Initial Transferee of the Pre-July 1998 Transfers . . . . . . . . . . . . . . . . . . . 29

II.    The Bankruptcy Court Did Not Clearly Err In Finding that the
       Post-July 1998 Transfers Were Not Fraudulent Transfers . . . . . . . . . . . . . . . . . . . 38

A.     The Parties' Post-Agreement Conduct Did Not Modify the Terms of the Daiwa Loan Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

B.     The Daiwa Transaction Was Not in Substance a Loan to Doctors Hospital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

     1.     MMA Funding Functioned as a Special Purpose Entity . . . . . . . . . . . 46

     2.     The Transfer of the Doctors Hospital Receivables was a True Sale . . 50

     3.     MMA Funding was not the Alter Ego or Instrumentality of Doctors Hospital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

C.     Viewing the Agreement as Written, the Post-July 1998 Transfers Were Not Made with Funds Belonging to Doctors Hospital . . . . . . . . . . . . . . 57

     1.     The Trust's Right to Receive Rent Payments Does Not Make the Cash Collateral Account Funds the Property of Doctors Hospital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

     2.     The Bankruptcy Court Did Not Clearly Err in Declining to Determine Ownership of the Collection Account Funds . . . . . . . . . . . 61

     3.     The Bankruptcy Court Did Not Clearly Err in Failing to Address Defendant's Admissions . . . . . . . . . . . . . . . . . . . . . . . . . . 63

     4.     The Bankruptcy Court at No Time Recognized the Transferred Funds as Property of Doctors Hospital . . . . . . . . . . . . . . . . . . . . . . . . 64

     5.     The Bankruptcy Court Did Not Treat the Unambiguous Transaction Documents Inconsistently . . . . . . . . . . . . . . . . . . . . . . . . 65

III.     The Trial Court Did Not Clearly Err In Concluding that Doctors Hospital was Insolvent as of August 28, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

A.     The Bankruptcy Court Did Not Apply Improper "Hindsight Bias" in Determining that Doctors Hospital was Insolvent as of August 28, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

B.     The Bankruptcy Court Did Not Err in Adopting Plaintiff's Experts' Opinions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

C.     Medicare/Medicaid Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

D.     Inflated Specific Company Risk Premium . . . . . . . . . . . . . . . . . . . . . . . . 76

E.     The $4.5 Million Add-back . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

F.     Reduction of Above-Market Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

IV.   The Bankruptcy Court Did Not Clearly Err in Treating
      Doctors Hospital as a Subchapter C Corporation for Valuation
      Purposes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

V.    Conclusion as to the Bankruptcy Court's Finding of Insolvency   . . . . . . . . . . . . . . . 84

VI.   The Bankruptcy Court Properly Concluded That the
      Pre-July 1998 Transfers Were Payments of Rent, not Debt . . . . . . . . . . . . . . . . . . . . . 84

      A.   HPCH Lease Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

      B.   Defendant Could Receive Payments of Rent . . . . . . . . . . . . . . . . . . . . . . . . . . 86

      C.   Defendant's Status as REMIC Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

VII.  The Court's Award of Prejudgment Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| LaSALLE NATIONAL BANK ASSOCIATION, ) | |
| f/k/a LaSalle National Bank, as Trustee ) | |
| for Certificate Holders of Assets ) | |
| Securitization Corporation, Commercial ) | |
| Pass-Through Certificates Series 1997, D5, ) | |
| ) | |
| Appellant, ) | |
| ) | No.    07 C 2722 |
| v. ) | 07 C 2815 |
| ) | 07 C 5231 |
| GUS A. PALOIAN, Chapter II Trustee of ) | 07 C 5232 |
| Doctors Hospital of Hyde Park, Inc., ) | |
| ) | |
| Appellee. ) | |

**MEMORANDUM OPINION AND ORDER**

Doctors Hospital of Hyde Park, Inc. (hereinafter "Plaintiff" or "Doctors Hospital" or "Debtor")

filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Northern District of

Illinois on April 17, 2000.  On April 15, 2002, Doctors Hospital filed an adversary complaint in the

bankruptcy court for the Northern District of Illinois, pleading a total of 28 counts against a number

of individuals and entities.  Counts VIII, IX, and X of the complaint assert claims against LaSalle

Bank National Association, f/k/a LaSalle National Bank ("Defendant" or "Trust"), as trustee for

certain asset certificateholders of Asset Securitization Corporation Commercial Mortgage Pass-

Through Certificates, Series 1997, D5.[1]  On April 22, 2004, Gus A. Paloian was appointed the

---

[1]       Among other defendants named in the adversary complaint were James Desnick,
the sole owner of Doctors Hospital, and various Desnick-controlled entities.  Included among the
claims were (1) allegations that Desnick and other corporate officers breached their fiduciary duties
to Doctors Hospital; (2) allegations that the financial transactions between Doctors Hospital and a
number of Desnick-controlled entities violated the Illinois Uniform Fraudulent Transfer Act and
constituted fraudulent transfers under § 548 of the Bankruptcy Code and unauthorized transfers
under § 549 of the Bankruptcy Code; (3) a claim for recovery of a debt owed to Doctors Hospital
by Desnick; (4) a count of conversion against Desnick; and (5) a count for equitable subordination
of Desnick's claim as a creditor in the Doctors Hospital bankruptcy proceeding.  *See LaSalle Bank
Nat. Ass'n v. Doctors Hosp. of Hyde Park*, No. 04 C 4319, 2005 WL 1766370, at *1 (N.D. Ill.
July 21, 2005), *aff'd*, 474 F.3d 421 (7th Cir. 2007) (approving, over LaSalle's objections, a
settlement between Doctors Hospital, Desnick, and the Desnick-controlled entities).

Chapter 11 trustee for Doctors Hospital. In its claims against Defendant, Doctors Hospital sought (1) to void as fraudulent transfers a guaranty and related security agreements that Doctors Hospital made in connection with a loan from Defendant's predecessor, Nomura Asset Capital Corporation, to Doctors Hospital's landlord (the "Nomura Loan," discussed below) (Count VIII); and (2) to void a lease (the "HPCH Lease", discussed below) held by Defendant as Nomura's assignee or to recover as fraudulent transfers payments of rent that Doctors Hospital had made to Defendant in excess of the property's fair market rental value (Counts IX and X).

Defendant filed a proof of claim in the bankruptcy case and a counterclaim in the adversary case, seeking approximately $60 million based on Doctors Hospital's guaranty and security agreements in connection with the Nomura Loan. Because the proof of claim in the bankruptcy case and Count VIII of the adversary proceeding were factually related to the guaranty and related security agreements between the parties, the bankruptcy court consolidated the adversary claims against the Trust and objections to the proof of claim for resolution at a trial on the issue of whether the agreements were voidable as fraudulent transfers.

Judge Schmetterer of the bankruptcy court conducted a bench trial on Counts VIII, IX, and X, and on March 2, 2007, issued his Initial Findings of Fact and Conclusions of Law. *In re Doctors Hosp. of Hyde Park, Inc.*, 360 B.R. 787 (Bankr. N.D. Ill. 2007). The findings relevant to this appeal are as follows:

(1)    Doctors Hospital was insolvent at all times between August 28, 1997 and April 17, 2000, the date it filed for bankruptcy;

(2)    Doctors Hospital's guaranty and security payments to Defendant pursuant to a loan Defendant made to Doctors Hospital's landlord were void as fraudulent transfers;

(3)    Defendant was the initial transferee of lease payments from Doctors Hospital prior to July 7, 1998;

(4)    Doctors Hospital's lease payments to Defendant were payments of rent, not debt;

(5)    Doctors Hospital's payments of rent prior to July 7, 1998 were fraudulent transfers to the extent they exceeded fair market value; and

(6)    Rental payments made after July 7, 1998 were not fraudulent transfers because they were not made with assets of Doctors Hospital.

2

The bankruptcy court also denied Defendant's request to void the lease pursuant to which the rental payments were made, a holding Defendant does not appeal here. For the rental payments made prior to July 7, 1998, the bankruptcy court awarded Plaintiff damages to the extent those payments exceeded fair market value and prejudgment interest in the total amount of $4,341,238.43. Based on the finding that Doctors Hospital's guaranty and security agreements were void as fraudulent transfers, the bankruptcy court granted summary judgment for Plaintiff on Defendant's proof of claim in the bankruptcy case, which was based on contractual obligations of Doctors Hospital under those agreements. Because those same agreements served as the basis for Defendant's adversary counterclaim, the court also ruled in favor of the Doctors Hospital on that claim, entering a claim denial order in the adversary proceeding. Both parties filed motions to alter or amend judgment, and both were denied in the bankruptcy court's Additional Findings of Fact and Conclusions of Law dated July 25, 2007. *In re Doctors Hosp. of Hyde Park, Inc.*, 373 B.R. 54 (Bankr. N.D. Ill. 2007).

Defendant and Plaintiff appealed separately from the bankruptcy court's judgment and claim denial orders, and the court consolidates the appeals here. The court addresses a total of four cases on appeal. Two of the cases represent the parties' appeals from the bankruptcy court's Amended Final Judgment in the adversary proceeding. In addition, Defendant filed separate appeals from the bankruptcy court's claim denial orders of its proof of claim in the bankruptcy proceeding and its counterclaim in the adversary proceeding. In Case No. 07 C 5231, Defendant appeals from the voiding of the guaranty and security agreements[2] and the award of damages based on the pre-July 1998 fraudulent transfers.[3] In case Nos. 07 C 2722 and 07 C 2815, Defendant appeals from the Claim Denial Orders on its bankruptcy claim and counterclaim in the

_____

[2] Amended Final Judgment Order ¶ 1, Chapter 11 Bankruptcy No. 00 B11520, Adversary No. 02 A 00363, entered March 23, 2007.

[3] *Id.* ¶ 2.

adversary proceeding.[4]  In Case No. 07 C 5232, Plaintiff appeals from the bankruptcy court's finding that the post-July 1998 rental payments were not fraudulent transfers.  For the reasons explained below, the judgment of bankruptcy court is affirmed.

**BACKGROUND**[5]

## I.    The Parties

**Doctors Hospital of Hyde Park** ("Plaintiff' or "Debtor") is an Illinois Subchapter S corporation that had its principal place of business at 5800 South Stony Island Avenue, Chicago, Illinois.  (Jt. Ex. 202 ¶ 1.)  From approximately August 24, 1992 until April 17, 2000, it was owned and controlled by Dr. James Desnick.  (Jt. Ex. 202 ¶ 30.)

**Gus A. Paloian** is the Chapter 11 bankruptcy trustee for Doctors Hospital.  Paloian brought this adversary suit in his capacity as trustee.

**James Desnick** is an Illinois resident.   At all relevant times, Desnick was the sole shareholder and director of Doctors Hospital.  (Jt. Ex. 202 ¶ 5.)

**LaSalle National Bank Association** ("Defendant" or the "Trust"), f/k/a La Salle National Bank, as trustee for certificateholders of Asset Securitization Commercial Mortgage Pass-Through Certificates, Series 1997, D5[6] by and through its servicer Orix Capital Markets, LLC ("Orix"), is a

---

[4]     Final Order Granting Summary Judgment Against LaSalle Bank as Trustee as to (1) Claim Number 486 in Bankruptcy Case No. 00 B 11520 and (2) Count II of its Counterclaim and Cross-Claim in Adversary No. 02 A 00363, entered March 29, 2007.

[5]     Unless otherwise noted, the facts are drawn from the bankruptcy court's "Findings of Fact and Conclusions of Law," *In re Doctors Hospital of Hyde Park, Inc.*, 360 B.R. 787 (Bankr. N.D. Ill. 2007) (hereinafter "Initial Findings," 360 B.R. at __ ), the bankruptcy court's "Additional Findings of Fact and Conclusions of Law," *In re Doctors Hospital of Hyde Park, Inc.*, 373 B.R. 53 (Bankr. N.D. Ill. 2007) (hereinafter "Additional Findings," 373 B.R. at __ ) and Stipulations by Plaintiff Doctors Hospital of Hyde Park and Defendant LaSalle, as Trustee, Jt. Ex. 202 (hereinafter "Jt. Ex. 202").

[6]     A "pass-through" is a type of mortgage-backed security created when one or more mortgage holders pool their mortgages and sell "certificates" in the pool.  Payments of principal, interest, and prepayments are passed through, typically monthly, to the certificateholders.  *See* (continued...)

trust that has elected to be treated as a Real Estate Mortgage Investment Conduit ("REMIC") under the Internal Revenue Code of 1986.  (Jt. Ex. 202 ¶ 2.)  LaSalle National Bank Association is a national banking association with its principal place of business in Illinois.  (*Id.*.)

**Orix Capital Markets** ("Orix") is the servicer of a pool of loans securitized by the Trust.  As the loans' servicer, Orix attempts to maximize the collection of principal, interest, and other amounts due under loans owned by the Trust, including the Nomura Loan.  (Jt. Ex. 202 ¶ 15.)

**Daiwa Healthco-2 LLC** ("Daiwa") is a Delaware limited liability company with its place of business located in New York, New York.  (Jt. Ex. 202 ¶ 3.)  It is a bankruptcy-remote corporation[7] associated with Dawia Securities America, Inc. and an affiliate of Daiwa Bank.   No information identifying Daiwa's owners and partners appears in the record.

**HPCH LLC** ("HPCH") is a Delaware limited liability company.  In July or August 1997, HPCH acquired record title of the Doctors Hospital property from HPCH Partners, L.P. (Jt. Ex. 202 ¶ 4.) HPCH is owned 99% by HPCH Partners, L.P. and 1% by its managing member, HP Membership.  Desnick is HPCH's managing partner and, as of August 1997, owned 100% of HP Membership and a controlling (approximately 99%) interest in HPCH Partners, L.P.  (Jt. Ex. 202 ¶ 13.)  The record does not identify any other partners or members.

**HPCH Partners, L.P.** is an Illinois limited partnership.  (Jt. Ex. 202 ¶ 8.)  As noted, HPCH Partners, L.P.  holds a 99% interest in HPCH.  HPCH Partners, L.P. is owned 1% by its general

---

[6](...continued)
*S.E.C. v. Quinlan*, No. 02-600082, 2008 WL 4852904, *1-*2 (E.D. Mich. 2008) (explaining the mechanics of mortgage pass-through certificates).

[7]     In basic terms, a bankruptcy-remote corporation, also known as a "single purpose" or "special purpose" entity, is created in conjunction with certain types of secured loan transactions as an entity "unlikely to become insolvent as a result of its own activities and that is adequately insulated from the consequences of any related party's insolvency."  STANDARD & POOR'S RATING SERVICES, *Section Four: Special Purpose Bankruptcy-Remote Entities*, U.S. CMBS LEGAL AND STRUCTURED FINANCE CRITERIA at 89 (May 6, 2003), http://www2.standardandpoors. com/spf /pdf/fixedincome/cmbslegalcriteria.pdf (last visited March 3, 2009).

partner, Stoney [*sic*] Island Ventures, which is wholly owned by Desnick.  HPCH Partners, L.P. is

99% owned by its limited partners. According to the parties' Supplemental Stipulation of Facts, the

partnership's tax returns lists its members, as of August 1997, as Desnick 95.2% and Dan Webb

3.8%.  The tax returns also identify two other "partners," Robert Krasnow and Stephen Weinstein,

but the parties have stipulated that Krasnow's and Weinstein's ownership interest in the partnership

is 0%; and the record does not identify the owner(s) of the remaining 1% limited partnership

interest.  The tax returns, again according to the parties' stipulations, also show that in September

1997, Desnick acquired Webb's interest, giving Desnick 99% of the limited partnership interest in

HPCH Partners.  (Jt. Ex. 202, Supp. Stip. 1.)

**HP Membership, Inc.** ("HP Membership") is a special purpose Delaware corporation, also

wholly owned by James Desnick.  The parties have stipulated that HP Membership holds a 1%

interest in HPCH.  (Jt. Ex. 202 ¶ 13.)  The stipulations also state, however, that this corporation may

have been dissolved for failure to file annual franchise reports. (Jt. Ex. 202 ¶ 9.)  The record

contains no further information about the current status of HP Membership.

**MMA Funding, Inc.** is a special purpose Delaware corporation and the special purpose

manager of MMA Funding, LLC.  Desnick is the 100% owner of MMA Funding, Inc.  (Jt. Ex. 202 ¶

11.)

**Medical Management of America, Inc.** ("MMA") is a Delaware corporation and was a

named manager of Doctors Hospital and HPCH, though in reality Desnick was the de facto

manager of both companies.  Desnick, Desnick Trust 1, and Desnick Trust 2 own 100% of MMA.

(Jt. Ex. 202 ¶ 10.)  Desnick and certain unnamed stockholders in MMA created  Desnick Trust 1

and Desnick Trust 2.  (Jt. Ex. 202 ¶¶ 6,7.)  Desnick holds a controlling interest in MMA.

**MMA Funding, L.L.C.** ("MMA Funding") is an Illinois limited liability corporation.  MMA

Funding is owned 99% by Doctors Hospital and 1% by MMA Funding, Inc.

**Nomura Asset Capital Corporation** ("Nomura") is a Delaware corporation with its principal

place of business located in New York City, New York.  (Jt. Ex. 202 ¶ 14.)

As reflected above, and stipulated by the parties, Desnick at all times owned and/or controlled Doctors Hospital, HPCH, MMA Funding, Inc., MMA Funding, HP Membership, and HPCH Partners, L.P. (Jt. Ex. 202 ¶ 18.)  The parties have stipulated that the chart attached as Exhibit A to this opinion illustrates the organization of these various entities.

## II.    History of Doctors Hospital

Doctors Hospital was built in 1916 by the Illinois Central Railroad as a component of its employee health insurance plan.  In 1960 the railroad sold the facility, and it became a not-for-profit entity, Hyde Park Community Hospital.   After the not-for-profit community hospital ceased operations, HPCH Partners, L.P., an entity controlled by Desnick, purchased the real estate and facilities for approximately $2,400,000.00 in 1992. (Jt. Ex. 202 ¶ 30.)

On August 24, 1992, HPCH Partners, L.P. leased the real estate located at 5800 South Stony Island Avenue, Chicago, Illinois, to Doctors Hospital until HPCH acquired the property sometime in July or August 1997.  On August 28, 1997, Doctors Hospital entered into a lease agreement with HPCH, discussed below.  Throughout its existence, Doctors Hospital utilized the property as a hospital.  (Jt. Ex. 202 ¶ 32.)  Doctors Hospital's revenue was largely derived from reimbursements from the government in the form of Medicare and Medicaid reimbursements, as well as payments from private insurance companies such as Blue Cross and Blue Shield. (Jt. Ex. 202, ¶ 31.)

## III.    The Daiwa Loan

Plaintiff appeals from the bankruptcy court's ruling that certain transfers to Defendant's account at the Defendant bank were not the property of Doctors Hospital and therefore could not be recovered by the Debtor as fraudulent transfers.  The transfers at issue stem from a March 31, 1997 loan from Daiwa to MMA Funding, Doctors Hospital's wholly-owned subsidiary (hereinafter the "Daiwa Loan"), and were made during the period from October 1997 until Doctors Hospital filed

for bankruptcy in April 2000. The Daiwa Loan was a revolving loan structured pursuant to a healthcare receivables securitization program. Under this program, Daiwa loaned funds to the wholly-owned subsidiaries of participating entities and in exchange, participating entities contributed receivables to their wholly-owned subsidiaries as security for the loan. Initial Findings, 360 B.R. at 799 ¶¶ 41-42. As discussed in greater detail below, the wholly-owned subsidiaries were structured as special purpose entities,[8] thereby insulating Daiwa from the possible bankruptcy of the participating entities. For this reason, the transaction documents identified the subsidiaries (but not the participating entities) as borrowers and Daiwa as lender under this program. Documents prepared by Daiwa representatives summarizing the structure of the Daiwa Loan identified Doctors Hospital and two other hospitals, Larkin Hospital and Gem-Care Nursing home, as the participating entities in the healthcare receivables securitization program. *Id.* at 799 ¶ 42. (Credit Approval Memorandum: Daiwa Securities America and Medical Management of America, Inc., Jt. Ex. 168 at 1.)

Under the Daiwa Loan Agreement in this case, Daiwa agreed to provide up to $25 million to MMA Funding in exchange for a security interest in MMA Funding's assets. Initial Findings, 360 B.R. at 797 ¶ 12, 799 ¶ 41. (Jt. Ex. 202 ¶ 41.) As part of the Daiwa Loan transaction, Doctors Hospital contributed all of its healthcare receivables to MMA Funding under a separate agreement, the "Healthcare Receivables Contribution Agreement" (hereinafter "Contribution Agreement"). (Jt. Ex. 5.) MMA Funding, in turn, assigned the receivables contributed by Doctors Hospital as collateral security in favor of Daiwa under another agreement titled "Assignment of Healthcare Receivables Contribution Agreement as Collateral Security by MMA Funding in favor of Daiwa" ("MMA Funding Assignment"). Initial Findings, 360 B.R. at 799 ¶ 43. In exchange for this assignment, Daiwa forwarded new loan advances to a bank account in the name of MMA Funding.

---

[8] See note 7 for an explanation of "special purpose corporation."

(Jt. Ex. 202 ¶ 40.)

As part of the Daiwa Loan Agreement, MMA Funding represented to Daiwa that MMA Funding was the "legal and beneficial owner" of the receivables. (Jt. Ex. 202 ¶ 48.) Plaintiff's appeal challenges MMA Funding's claim to ownership and control over the receivables for the period beginning July 7, 1998 through Doctors Hospital's April 2000 bankruptcy filing. *See* Initial Findings, 360 B.R. at 846-55.

Certain provisions of the Daiwa Loan transaction documents are relevant to Plaintiff's claims on appeal. First, Daiwa, the lender, and MMA Funding, the borrower, are the only signatories to the Daiwa Loan agreement; Doctors Hospital is a signatory to other agreements related to the Daiwa Loan transaction (for example, the Contribution Agreement), but was not a signatory to the Loan Agreement itself. (Jt. Ex. 202 ¶ 43.) The Daiwa Loan Agreement provides that MMA Funding (and only MMA Funding) "may borrow, repay, (without premium or penalty) and reborrow the Revolving Loan." (*Id.* ¶ 45.) It also requires MMA Funding to grant Daiwa a first priority lien on and a security interest plus setoff rights in all healthcare receivables and proceeds of receivables contributed by Doctors Hospital to MMA Funding under the terms of the separate Contribution Agreement. (*Id.* ¶ 49.) Doctors Hospital is not, however, identified in the Daiwa Loan Agreement as the contributor of the receivables. (Loan and Security Agreement, Jt. Ex. 1.) The Daiwa Loan Agreement requires MMA Funding to submit borrowing base certificates[9] to Daiwa in connection with each advance under the loan. (Loan and Security Agreement, Jt. Ex. 1)

The Agreement's terms further provide that MMA Funding would designate the account into which Daiwa would transfer new borrowings. (Jt. Ex. 202, ¶ 59.) From April 1997 (the inception

---

[9]       Banks and other lenders use borrowing base certificates to monitor a borrower's borrowing base over the life of a loan. For example, the borrowing base certificates submitted by MMA Funding list its accounts receivable balance, its total (i.e., gross) collateral, the Daiwa Loan balance, and the amount of any requested loan advance, as well as other details relating to its assets. (*See* Borrowing Base Certificates, Def. Ex. 9.)

of the Daiwa Loan) until July 7, 1998, Daiwa transferred new borrowings at MMA Funding's direction directly to Grand National Bank account #6700010103, an account titled in the name of MMA Funding. (Jt. Ex. 202.) Daiwa initially transferred $7,975,500.00 to MMA Funding. Approximately $6,524,000.00 of that amount was used to retire an existing line of credit that MMA had obtained for the benefit of Doctors Hospital, Desnick and his affiliates; approximately $1,372,000.00 was made available to Doctors Hospital; the remainder was used to pay expenses relating to the transaction. (Jt. Ex. 202 ¶ 61.) After July 7, 1998, MMA Funding directed new borrowings to be transferred directly to a bank account controlled by Defendant, LaSalle National Bank, pursuant to the terms of the Nomura loan, discussed below.

The principal of the Daiwa Loan was never fully paid down. The loan had an original maturity date of March 31, 1999, twenty-four months from its inception. (Jt. Exs. 1, 4.) MMA Funding and Daiwa extended this date to March 31, 2001 in their third amendment to the Daiwa Loan Agreement. (Jt. Ex. 4.) As of March 2000, one month before the bankruptcy filing, approximately $10.3 million of the Daiwa Loan was still outstanding. (Jt. Ex. 202 ¶¶ 54, 55.)

A. **MMA Funding's Function as a Special Purpose Entity under the Daiwa Loan**

The bankruptcy court found that MMA Funding was created as a "special purpose entity" pursuant to the terms of the Daiwa Loan transaction, a finding Plaintiff disputes on appeal. *See* Initial Findings, 360 B.R. at 847-48. According to the findings of the bankruptcy court, MMA Funding was created in conjunction with the Daiwa Loan for the specific purpose of shielding its assets— the contributed healthcare accounts receivable—from Doctors Hospital's creditors in the event of Doctors Hospital's bankruptcy. Initial Findings, 360 B.R. at 847. Thus, MMA Funding's "special purpose" was to protect Daiwa as lender from the risk that MMA Funding's operating company, Doctors Hospital, might file for bankruptcy. With this shield against the risk of losing its stake in MMA Funding's assets to Doctors Hospital's bankruptcy creditors, it could make the loan at a lower interest rate than would otherwise be available to Doctors Hospital.

The bankruptcy court found that the parties to the Daiwa Loan—MMA Funding and Daiwa—relied on MMA Funding's separate special purpose status in entering into the Loan Agreement. Initial Findings, 360 B.R. at 852. In subparagraph (p) of Exhibit IV to the Daiwa Loan Agreement, MMA Funding covenanted to Daiwa that it would observe all of its obligations under the Contribution Agreement. (Daiwa Loan Agreement, Ex. IV(p) to Jt. Ex. 1.) Such obligations included all of the "Special Covenants of Corporate Separateness" in Exhibit IV to the Contribution Agreement (the "Separateness Covenants"), pursuant to which MMA Funding agreed to be a separate and distinct corporate entity from Doctors Hospital. (Ex. IV to Jt. Ex. 5.) Daiwa memoranda prepared in connection with the Daiwa Loan indicate that Daiwa would not have entered into the Loan Agreement without the establishment of MMA Funding as a special purpose entity with a separate corporate identity. (Credit Approval Memorandum, Jt. Exs. 117, 168.)

Phillip Robinson, the chief financial officer of MMA Funding, Inc., testified at trial that MMA Funding was never intended to be an operating company; rather, it was formed as a special purpose entity in March 1997 to fit the structure of the Daiwa Loan. (Tr. II: 23-25.) Throughout the life of the Daiwa Loan, MMA Funding had no active checking account, no insurance, and no phone. Initial Findings, 360 B.R. at 803 ¶ 97. (Tr. 1:116-20.) There is no evidence of any balance sheets or profit-and-loss statements prepared for MMA Funding after the Daiwa Loan closed, and MMA Funding never filed a tax return.[10] Initial Findings, 360 B.R. at 803 ¶ 94. (Jt. Ex. 202 ¶ 65.)

Defendant introduced into evidence borrowing base certificates submitted by MMA Funding to Daiwa for the months of August 1998 through March 1999. (Def. Ex. 9.) The record also includes a letter and borrowing base certificate dated June 16, 1998, signed by MMA Funding officers in the name of MMA Funding, but printed on Doctors Hospital stationary, an apparent

---

[10] The bankruptcy court found explicitly that "no balance sheets . . . were prepared for MMA Funding after the Daiwa Loan closed." A balance sheet prepared at the time of the closing showed MMA Funding as the owner of the receivables. *See* Initial Findings, 360 B.R. at 803, ¶¶ 93, 94. The cited exhibit, Jt. Ex. 172, was not included in the record on appeal.

violation of MMA Funding's obligation, set forth in its operating agreement, to "maintain its own separate stationary." (Letter from MMA Funding to Daiwa re Borrowing Base Certificates, June 16, 1998, Jt. Ex. 61; Operating Agreement of MMA Funding, Jt. Ex. 174, Art. III (7)).

MMA Funding and Daiwa executed three amendments to the Daiwa Loan Agreement on August 21, 1997, August 26, 1997, and February 25, 1999. None of these amendments, admitted as Joint Exhibits 2, 3, and 4 below, appears in the record on appeal, but it is undisputed that Doctors Hospital was not a signatory to any of these amendments. Initial Findings, 360 B.R. at 802 ¶ 74.

### B. The Contribution of Doctors Hospital's Healthcare Receivables Under the Daiwa Loan

Plaintiff appeals the bankruptcy court's finding that Doctors Hospital's contribution of healthcare receivables to MMA Funding constituted a "true sale."[11] The Healthcare Receivables Contribution Agreement (hereinafter "Contribution Agreement") between MMA Funding and Doctors Hospital provided for the transfer from Doctors Hospital to MMA Funding of "all right, title, and interest in and to such Receivables" on certain transfer dates specified in the transaction

---

[11]     For a special purpose entity to be "bankruptcy remote," the transfer of assets from the debtor must a be a "true sale" under state law, as opposed to a disguised loan. The use of a "true sale" in the specific context of a securitization is a relatively recent development, and a dearth of case law has made the requirements of a "true sale" of assets to a special purpose entity somewhat uncertain. Stephen J. Lubben, *Beyond True Sales: Securitzation and Chapter 11*, 1 N.Y.U.J.L. & BUS. 89, 92-97 (2004). At a minimum, a true sale must be a sale in substance, as opposed to a mere transfer for security. One scholar has described the substantive requirements for at true sale as follows:

> [T]he transferor should transfer most of the benefits and burdens of ownership. In the case of the transfer of receivables, this requires that the buyer receive most of the risk of loss from default by the obligors and most of the opportunity for gain or loss in the market value of the receivables. Finally, the seller must receive fair market value for the transfer of benefits and burdens of ownership and for retention of any of those risks.

Thomas E. Plank, *The Security of Securitization and the Future of Security*, 25 CARDOZO L. REV. 1655, 1675 (2004) (internal citations omitted). The bankruptcy court did not define the term "true sale," but did cite the Plank article. 360 B.R. at 848.

documents.  (Jt. Ex. 202 ¶ 50.)  The Contribution Agreement identifies the transfer of healthcare receivables as "a full and complete transfer of ownership and not a loan," (Covenants, Ex. IV to Jt. Ex. 5 ¶ 5.08), and provides for the transfer of receivables to occur not only on the closing date of the Daiwa Loan, but on a continuing basis throughout the life of the Loan.  (Contribution Agreement Jt. Ex. 5 ¶ 1.10.)  A separate provision of the Contribution Agreement reiterates the parties' intent that the transfer be treated "as a full and complete transfer of ownership" and specifies that in the event it is not recognized as such, Doctors Hospital shall be deemed to have granted a security interest to MMA Funding in the receivables.  (Jt. Ex. 202 ¶ 52.)  Doctors Hospital later explicitly ratified the transfer of receivables as a "true sale" in an amendment to the Contribution Agreement dated February 25, 1999.  Initial Findings, 360 B.R. at 800 ¶ 55.

The bankruptcy court admitted into evidence two UCC-1 financing statements[12] executed in connection with the Daiwa Loan.  Doctors Hospital executed a UCC-1 statement in connection with the transfer of its receivables to MMA Funding, and MMA Funding, in turn, executed a separate UCC-1 statement granting security interests in the receivables to Daiwa.  Initial Findings, 360 B.R. at 802 ¶¶ 70, 71.[13]  Doctors Hospital's financial statements do not reflect a transfer of any accounts receivable to MMA Funding for fiscal years 1997, 1998, or 1999.  (Jt. Ex. 202 ¶¶ 63, 64, 65.)  Rather, the receivables were listed as assets of Doctors Hospital on its audited financial statements for all three fiscal years.  (*Id.* ¶ 63.)  These statements further represent that Doctors Hospital "maintains a revolving line of credit arrangement pursuant to a Loan and Security Agreement dated March 31, 1997," and that "[a]ll eligible patient accounts receivable of the Hospital are pledged as collateral to secure the revolving line of credit." (*Id.* ¶ 66.)

---

[12]　　In Illinois, a lender files a UCC-1 statement with the Secretary of State to record and perfect its security interest in the personal property the debtor offers as collateral for the loan.

[13]　　Exactly when the UCC-1 statements were executed is not specified in the bankruptcy court's opinion, and the statements themselves were not included in the record on appeal.

In an effort to establish that the transfer of the receivables from Doctors Hospital to MMA Funding constituted a "true sale," Isaac Solemoni, Senior Vice President at Daiwa in charge of its healthcare receivables lending business, testified that the Daiwa Loan was a loan between Daiwa and MMA Funding to which Doctors Hospital contributed its receivables, not a loan between Daiwa and Doctors Hospital. Initial Findings, 360 B.R. at 801 ¶ 61. Philip Robinson, the CFO of MMA Funding, testified, similarly, that MMA Funding was always the "documented borrower" under the Daiwa Loan (Tr. I at 178), and that on the closing date of the Daiwa Loan there was "no question" that MMA Funding and Doctors Hospital were separate corporate entities. (Tr. I at 188.)

The bankruptcy court made the following additional findings of fact: On March 31, 1997, the law firm of Chuhak & Tecson, P.C. issued an opinion letter concerning MMA Funding's role as a special purpose entity. The law firm of Shefsky & Froelich also delivered an opinion that the transfer of the healthcare receivables constituted a "true sale." Desnick, as CEO of Doctors Hospital, executed Officer's Certificates in support of both legal opinions.[14] Initial Findings, 360 B.R. at 801. Finally, the correspondence of Stephen Weinstein, the chief executive officer of Doctors Hospital from September 1994 to September 1998, confirms a finding that Doctors Hospital transferred its healthcare receivables to MMA Funding. On June 1, 1997, Weinstein sent letters to Blue Cross/Blue Shield of Illinois, to the Comptroller for the State of Illinois, and to more than 100 private insurers, stating that Doctors Hospital had "contributed to [MMA Funding] the currently existing receivables payable by you to [Doctors Hospital] and we intend to contribute to [MMA

---

[14] These findings are undisputed, but the exhibits that the bankruptcy court cites were not included in the record on appeal, so this court is unable to access the significance of either the opinion letters or the "Officer's Certificates." The court notes, however, that it is common for parties to a securitization to solicit opinions concerning an intended special purpose entity's separate status and whether a transfer of assets to that entity would be sufficient to isolate them from the transferor. See Sandra Schnitzer Stern, "Isolation and the True Sale Opinion," in STRUCTURING AND DRAFTING COMMERCIAL LOAN AGREEMENTS ¶ 12.19[5][B] (2008) (noting that in transfers of assets to special purpose entities in the context of a securitization, the documentation for the securitization frequently includes a "true sale" opinion from an attorney).

Funding] hereafter arising receivables payable by you to [Doctors Hospital]."  (Jt. Ex. 202 ¶¶ 67, 68, 69.)

## IV.    The HPCH Lease/Nomura Loan

In addition to the Daiwa Loan dispute, both parties have challenged the bankruptcy court's findings concerning certain rent payments to Defendant under a separate agreement between Doctors Hospital and its landlord, HPCH.  Defendant appeals from the bankruptcy court's holding that certain transfers of rent made from Doctors Hospital to Defendant between August 1997 and July 1998 were void as fraudulent transfers.  Plaintiff defends the court's determination that those transfers were voidable but appeals the bankruptcy court's holding that transfers of rent made after July 1998 were not void as fraudulent transfers.  The transfers at issue in both appeals are governed by a lease between Doctors Hospital and its landlord, HPCH, (the "HPCH Lease"), and by a loan from Nomura to HPCH (the "Nomura Loan"), described below.

In July or August of 1997, HPCH acquired legal title to the Doctors Hospital property from HPCH Partners, L.P.  On August 28, 1997, Doctors Hospital entered into an agreement with HPCH to lease the Hospital property for approximately $470,000 per month.  (Jt. Ex. 202 ¶¶ 86, 88.)  On that same date, Nomura made a loan to HPCH in the amount of $50 million.  (Jt. Ex. 202 ¶¶ 70, 72.)  Under its lease with HPCH, Doctors Hospital paid rent on a net basis equal to the debt service payment owed by HPCH on the Nomura Loan.  Initial Findings, 360 B.R. at 808 ¶¶ 126, 138.  (Jt. Ex. 158.)  Rent payments on the HPCH Lease were HPCH's only source of income, and HPCH owned no property other than the hospital property and had no tenants other than Doctors Hospital.  (Jt. Ex. 202 ¶¶ 96, 111.)  HPCH assigned to Nomura all of its rights in the HPCH Lease and the rental payments due thereunder.  (*Id.* ¶ 94.)  The Nomura Loan was secured by the HPCH Lease, the hospital real estate, hospital equipment, accounts receivable, and other intangibles relating to Doctors Hospital.  (*Id.* ¶¶ 70, 75.)  Doctors Hospital also executed and delivered a Guaranty to Nomura for the entire amount of the loan.  (*Id.* ¶ 73.)  As security for its performance under that

Guaranty, Doctors Hospital executed an Assignment of Management Agreement and Agreements Affecting Real Estate, by which Doctors Hospital assigned to Nomura all its rights in contracts with third parties made in connection with the management, construction, renovation, use, and operation of Doctors Hospital's facilities. Finally, Doctors Hospital executed an Equity Pledge Agreement granting Nomura a security interest and lien on all of Doctors Hospital's 99% interest in MMA Funding. (*Id.* ¶ 81.) Doctors Hospital represented to Nomura that it did not "have any defense or right of offset with respect to its rights, duties, and obligations under the [Pledge] or the [Lease], or any claim of right against [HPCH]." (*Id.* ¶ 77)

It is undisputed that although HPCH and Nomura were the parties to the Nomura Loan Agreement and Doctors Hospital the guarantor, the Nomura Loan was intended primarily to benefit Desnick, and initially all proceeds of the Loan were deposited into an account titled in the name of Desnick and his spouse. (*Id.* ¶ 85.) Doctors Hospital received none of the proceeds of the Nomura Loan. (Joint Pretrial Statement on Doctors Hospital's Mot. to Approve Settlement with Desnick and Other Defendants, Jt. Ex. 135 ¶ 31.) Nor did Desnick make any payments on that Loan; HPCH alone was responsible for debt service payments and other payments. Absent an Event of Default under the Nomura Loan documents, Doctors Hospital had no obligation to make any such payments. (Jt. Ex. 202 ¶ 74.) MMA Funding also had no obligation to satisfy any obligations due to Nomura under the Nomura Loan or to make rent payments to HPCH. (*Id.* ¶ 74.)

## V.     Transfer of the Nomura Loan to the Trust

On October 24, 1997, two months after entering into the Nomura Loan Agreement, Nomura entered a Mortgage Loan Purchase and Sale Agreement ("MLPSA"), transferring all its rights, title, and obligations relating to the Nomura Loan, including those relating to the HPCH Lease, to the Asset Securitization Corporation ("ASC"), a Delaware corporation with its principal place of business in New York, New York. Initial Findings, 360 B.R. at 809 ¶ 142. Contemporaneously with the execution of the MLPSA, on October 24, 1997 ASC, LaSalle National Bank and others entered

into a Pooling and Servicing Agreement ("PSA"), under which ASC, as "depositor," sold all its rights, title, and obligations under the Nomura Loan to Defendant LaSalle as ASC's trustee.  (Jt. Ex. 202 ¶¶ 105, 106.)  The Nomura Loan thereafter became part of a pool of loans owned by the Defendant and serviced by Orix.  As servicer, Orix was responsible for collection of principal and interest and other amounts due under the loans, including the Nomura Loan.  (Jt. Ex. 202 ¶ 109.)  In the event of a default, the PSA also designated Orix as the Loan's Special Servicer, a role that requires Orix to manage the defaulted loan, including the commencement of foreclosure proceedings, if required. (PSA, Jt. Ex. 23 at 55-56.)  Orix was the successor-in-interest to AMRESCO Management, Inc., the Trust's original servicer and special servicer under the PSA.  (Jt. Ex. 202 ¶ 108.)

## VI.    Cash Flow Under the Daiwa and Nomura Loans

The history of cash flows under the Daiwa Loan and the Nomura Loan transactions can be divided into three periods: the period from the execution of the Daiwa Loan to the execution of the Nomura Loan; the period from the execution of the Nomura Loan, August 28, 1997 to July 7, 1998; and the period after July 7, 1998.  The bankruptcy court determined that Doctors Hospital was insolvent as of August 28, 1997.  *See* attached Exhibits B, C and D, taken from the parties' stipulations, for an illustration of the cash flows within these time periods.

### A.    Cash Flow Before the Nomura Loan

For the first period, before the inception of the Nomura Loan, repayment of the Daiwa Loan moved through a series of lockboxes and bank accounts.  This movement of cash was initially governed by a "Depository Agreement" among MMA, MMA Funding, Daiwa, and Grand National Bank.  (Jt. Ex. 202 ¶ 41.)  Cash originating from Medicare and Medicaid receivables first went to a joint Doctors Hospital-Daiwa account at Grand National Bank. These receipts were then "swept" to another account at Grand National Bank in the name of Daiwa only. The latter account also received cash originating from payments made by insurance companies such as Blue Cross/Blue Shield.  From the Daiwa-controlled account at Grand National Bank, the funds were swept to

another Daiwa Account at the Bank of New York. The Bank of New York account received not only the cash described above, but also funds related to Daiwa's financing arrangements with many other borrowers. (Jt. Ex. 202 ¶ 110.) Daiwa took withdrawals from these commingled funds to retire the debt owed under the Daiwa Loan. (Jt. Ex. 202 ¶ 111.)

As contemplated in the Daiwa Loan agreement, Daiwa forwarded new borrowings under the Daiwa Loan's revolving structure during this period to an account titled in the name of MMA Funding. (Jt. Ex. 202 ¶ 112.) Funds transferred to the MMA Funding Account were automatically forwarded to Doctors Hospital's operating/payroll account at Grand National Bank. (Jt. Ex. 202 ¶ 113.)

**B.    Cash Flow After the Nomura Loan and Up to July 7, 1998**

The Nomura Loan called for the creation of additional restricted bank accounts and other significant changes in the way that cash flowed through the accounts under the Daiwa Loan. Due to the complexity of the Nomura Loan transaction documents, however, these changes were not implemented until July 7, 1998. (Jt. Ex. 202 ¶ 114.)

The parties executed four documents to facilitate the integration of the Nomura Loan with the already-existing Daiwa Loan: (1) the Intercreditor Agreement, (2) the Cash Collateral Agreement, (3) the Collection Account Agreement, and (4) the Payment Direction Letter. These documents (collectively the "Cash Flow Agreements") restructured the flow of funds between Daiwa, MMA Funding, Defendant LaSalle, and Doctors Hospital, in part through the creation of two new bank accounts: the Cash Collateral Account and the Collection Account. The Cash Collateral Account was located at LaSalle National Bank and was under LaSalle's control, as Nomura's successor in interest. The Collection Account was maintained at Grand National Bank in Northwood, Illinois, and was also under LaSalle's control, again as Nomura's successor. Initial Findings, 360 B.R. at 812 ¶¶ 166, 167, 168, 169, 202.

Baffled by the complexity of the Cash Flow Agreements and concerned about complying with their terms, Phillip Robinson, the CFO of MMA, approached the accounting firm of KPMG on November 7, 1997 for help resolving the meaning of the Agreements. Initial Findings, 360 B.R. at 813, ¶ 176. John Depa, a KPMG representative, agreed with Robinson that the Nomura documents were extremely difficult to interpret and expressed his opinion that they made cash management needlessly cumbersome and inefficient. *Id.* ¶¶ 176, 177. Indeed, as described below, cash flow did not strictly comply with the terms of the Cash Flow Agreements. Later in November 1997, Depa proposed amending or simplifying the documents, or in the alternative, suggested that Nomura and HPCH draft a "clarification amendment" to the various documents to articulate plainly all the compliance steps required. *Id.* ¶¶ 178, 179, 180. AMRESCO, the predecessor to Orix as servicer and special servicer of the pool which included the Nomura Loan,

rejected these proposals. *Id.* ¶¶ 186, 187. AMRESCO instead advised Robinson in June 1998 of the appropriate steps for compliance with the terms of the Cash Flow Agreements and the Nomura Loan. *Id.* ¶¶ 188. Robinson confirmed the process for compliance with Richard Felbinger, the CFO of Doctors Hospital, and money flows began to adhere to the terms of the Nomura transaction documents beginning July 7, 1998, as described in subsection c, below. *Id.* ¶¶ 189, 190.

During the period of confusion between August 28, 1997 and July 7, 1998, the cash flow under the Daiwa Loan and the Nomura Loan transaction documents proceeded as follows: As it had done in the period prior to the Nomura Loan, Daiwa forwarded new borrowings to an account titled in the name of MMA Funding, and funds transferred to the MMA Funding Account were automatically forwarded to Doctors Hospital's general payroll account at Grand National Bank. (Jt. Ex. 202 ¶¶ 113.) Doctors Hospital then made direct transfers from its general payroll account to the Trust's Cash Collateral Account at LaSalle National Bank. The Trust used funds from the Cash Collateral Account to service HPCH's debt and other obligations on the Nomura Loan until July

1998. (Jt. Ex. 202, ¶ 115.) The bankruptcy court found that these payments exceeded fair market value for rent under the HPCH Lease and were made after Doctors Hospital became insolvent.

### C. Cash Flow After July 7, 1998

Beginning July 7, 1998, the parties began to act in conformance with the terms of the Nomura Loan, and as a result, all advances from the Daiwa Loan were made directly from Daiwa to the Trust's Cash Collateral Account without first passing through either MMA Funding or Doctors Hospital. This cash flow practice adhered to the terms of the Intercreditor Agreement between Daiwa and Nomura and those of the Cash Collateral Account Agreement, both entered into on August 28, 1997, the date of the Nomura Loan. The Intercreditor Agreement sets forth Daiwa's and Nomura's respective rights and obligations concerning new borrowings under the Daiwa Loan. The Cash Collateral Account Agreement provides, in relevant part: "Daiwa has been instructed by [Doctors Hospital], [MMA Funding] and [Nomura] to deposit all [new borrowings under the Daiwa Loan] directly into the [Nomura Account]." Initial Findings, 360 B.R. at 815 ¶¶ 191, 192. (Jt. Ex. 202 ¶¶ 118, 119.) Before reaching the Nomura Cash Collateral Account, the funds were routed through LaSalle National Bank Account # 2090067, which was a general ledger account that received all cash coming into LaSalle National Bank's Trust Department, including cash related to the Nomura Loan.

Also beginning on July 7, 1998, a Collection Account was created at Grand National Bank to receive "miscellaneous receipts of Doctors Hospital that were not part of the Daiwa receivables borrowing base." 360 B.R. at 815 ¶ 190. (Jt. Ex. 14, sec. 16.) The funds in the Collection Account were then transferred to the Cash Collateral Account pursuant to the Collection Account Agreement among Grand National Bank, HPCH, Doctors Hospital, and Nomura. 360 B.R. at 815, ¶ 190. From July 1998 through April 2000, Doctors Hospital deposited $3,712,818.46 in receipts from its accounts into the Collection Account. 360 B.R. at 818-19 ¶ 215.

The funds in the Cash Collateral Account consisted of advances from Daiwa to MMA

Funding under the Daiwa Loan Agreement, funds from the Collection Account, and any interest income received on these combined assets. Initial Findings, 360 B.R. at 846. Each month, the Trust withdrew from the Cash Collateral Account amounts sufficient to fund reserve accounts for capital improvements, taxes, and insurance, and the debt service on the Nomura Loan (the "Reserve Accounts"). After July 7, 1998, funds representing the debt service payments were forwarded to the Trust's certificateholders.[15] After the payment of expenses and the funding of the Reserve Accounts, any excess funds in the Nomura Cash Collateral Account were then sent to Doctors Hospital's general operating account. Initial Findings, 360 B.R. at 815 ¶ 192.

In summary, between August 28, 1997 and July 7, 1998, Doctors Hospital made transfers directly to the Nomura Cash Collateral Account, controlled by Defendant, and Defendant accepted these transfers and used them to make payments on the Nomura Loan. It is these transfers that Judge Schmetterer concluded were void to the extent they excluded fair market value of the rent on the Doctors Hospital property. From July 7, 1998 through April 2000, the Trust took payments owed under the Nomura Loan from deposits made by Daiwa into the Cash Collateral Account at the direction of MMA Funding. It then forwarded to the certificateholders funds representing debt service payments.

## VII. Doctors Hospital's Insolvency

The bankruptcy court found that Doctors Hospital was insolvent as of August 28, 1997 and at all times from August 28, 1997 through April 17, 2000, the date Doctors Hospital filed for bankruptcy. Defendant disputes the date of insolvency, contending that the bankruptcy court

---

[15] At one point in the Initial Findings, the bankruptcy court refers to the Trust's certificateholders as "bondholders." Initial Findings, 360 B.R. at 815 ¶ 192. The court presumes this transcription has its origins in the Stipulations by Plaintiff Doctors Hospital of Hyde Park and Defendant LaSalle, as Trustee, in which the parties also refer to the Trust's "bondholders" using similar language. (Jt. Ex. 202 ¶ 119.) Elsewhere, the bankruptcy court speaks strictly of the Trust's "certificateholders." *See, e.g.*, Initial Findings, 360 B.R. at 816 ¶ 200; Additional Findings, 373 B.R. at 70-71.

applied improper "hindsight bias" in its analysis by considering information that would not have been known to a hypothetical buyer of Doctors Hospital in August of 1997 and ignoring contemporary data supporting Doctors Hospital's solvency at that time. The bankruptcy court based its insolvency finding on the following evidence adduced from the pleadings and at trial.

### A. Expert Testimony

Much of the evidence presented on Doctors Hospital's insolvency came from expert reports and testimony. Michael Lane and Scott Peltz testified for Plaintiff. The trial court certified Lane as "an expert in the healthcare industry, healthcare financing (including receivables financing), Medicare/Medicaid (including Medicare/Medicaid reimbursement), and the Chicago metropolitan area healthcare market." Initial Findings, 360 B.R. at 819. Lane worked with Doctors Hospital's creditors committee and counsel from August 2000 through trial. Peltz, a certified public accountant and financial advisor in the fields of corporate recovery and financial restructuring, was also approved as an expert and, along with Lane, prepared a report assessing Doctors Hospital's solvency from fiscal year 1997 through its filing for bankruptcy in 2000. (Jt. Ex. 72, hereinafter the "Lane/Peltz Report.") (Tr. IV:60-66.) The Lane/Peltz Report concluded that Doctors Hospital was insolvent from August 28, 1997, the date of the Nomura Loan, through April 17, 2000. (Jt. Ex. 72 at 19.)

Thomas Blake testified for Defendant as a rebuttal expert regarding Doctors Hospital's solvency. Blake is not a healthcare expert, and he received assistance from Rene Prew, whom Blake identified as a "healthcare specialist" at his firm, in preparing his report. (Jt. Ex. 31, hereinafter the "Blake Report.") His report concluded that Doctors Hospital was solvent on a fair market balance sheet basis as of September 30, 1997 and throughout 1998. (Jt. Ex. at 31.)

Lane and Peltz employed three different tests in assessing Doctors Hospital's solvency: the "fair market balance sheet" test, the "adequacy of capitalization" test, and the test of ability to repay debt. *See* 11 U.S.C. § 548. (Jt. Ex. 72 at 5.) Under the first of these, the balance sheet test, Lane

and Peltz valued Doctors Hospital as a going concern and applied the "capitalization of normalized cash flow" method to determine Doctors Hospital's enterprise value. They also applied the "capital markets" (or "guideline company") method and the "merger and acquisition" (or "guideline transactions") method to corroborate their results under the capitalization of normalized cash flow method. Initial Findings, 360 B.R. at 854. All three methods showed a negative fair value of equity under the balance sheet test, and thus insolvency, as of August 28, 1997. *Id.* The trial court relied on the capitalization of normalized cash flow method in reaching its conclusion as to Doctors Hospital's date of insolvency. The court also adopted the Lane/Peltz Report's conclusions with respect to the other two insolvency tests: namely, that it had inadequate capital and that it was unable to pay its debts as they came due, as of August 28, 1997.

Blake agreed that the capitalization of normalized cash flow method employed by Plaintiff's experts was the proper method for determining Debtor's enterprise value under the balance sheet test of insolvency, and Blake used that method in his own analysis. Blake differed, however, on normalization assumptions and valuation-related calculations, as summarized in the analysis below. Blake concluded that Doctors Hospital was solvent as of September 30, 1997 under the balance sheet test, as well as under the adequate capital test and ability to pay debts test.

### B.    Other Evidence of Insolvency

Based on the evidence presented at the eight-day trial, Judge Schmetterer made detailed additional findings, set forth in his opinion at 360 B.R. at 834-38. In summary, Judge Schmetterer identified a number of factors that compromised Doctors Hospital's financial integrity:

- Doctor's Hospital had a disproportionate amount of revenue from Medicaid and Medicare, programs that reimburse healthcare providers at a lower rate than private insurers. Financial statements show that Doctors Hospital's revenues from these two federal programs ranged from 85% to 89%, while the average Chicago hospital's revenue from Medicaid and Medicare was approximately 50%. Doctors Hospital's "case mix index"—an indicator of the acuity level of patients treated at the hospital—declined from 1.5 in 1996 (about average) to 1.1 in 1999, a result of reduction of the hospital's medical/surgical business and increase in lower severity cases, such as psychiatric, skilled nursing, and substance abuse cases.

- As of 1996, the average length of stay per patient at Doctors Hospital was significantly higher than that of other hospitals in its market, and, although the length of stay decreased after 1996, it remained longer than industry norms. Medicare and Medicaid reimbursed the hospital on a per-case basis rather than based on the length of stay; Doctors Hospital thus received a lower percentage of reimbursement for the costs incurred in these longer stays.

- The supply of hospital beds in the market served by Doctors Hospital exceeds the demand by 37%.
- RTKL Associates, Inc., an architectural firm, confirmed Plaintiff's expert's valuation of the hospital; RTKL depreciated the hospital's estimated reproduction cost by almost 70%.

- Desnick's own reputation was compromised: In 1991, he settled a claim brought against him by the Illinois Department of Professional Regulation, paying a $100,000 fine and agreeing to a two-year suspension of his license. He was also named as a defendant in two *qui tam* actions charging him with billing for unnecessary procedures.

- The federal Balanced Budget Act of 1997, which took effect beginning in 1998, included a number of provisions designed to slow growth in Medicare spending, reduce reimbursements for inpatient care and for bad debts, and "move payments for outpatient services from a cost-based system to a prospective one." (Jt. Ex. 31, Tab C at 17-18.) Analysts predicted that the changes would force "inefficient, older, freestanding hospitals" out of business. (Jt. Ex. 53 at 117.) Allen Dobson, an expert retained by Nomura in litigation with the Defendant,[16] estimated that as a result of the BBA, in 1997, Doctors Hospital could have expected to lose $1.3 million in Medicare payments in 1998 and $3.7 million more in 1999. Lane testified that many of the reductions resulting from the BBA began on July 1, 1998.

- Healthcare and pharmaceutical costs experienced high inflation in the late 1990's, and due to nursing shortages, Doctors Hospital was forced to rely on more expensive agency nurses.

In addition to these financial stressors, Judge Schmetterer's opinion described two federal investigations into Medicare and Medicaid violations at Doctors Hospital. The first investigation focused on billing irregularities, called "upcoding," in which doctors intentionally misdiagnosed patients in order to obtain larger Medicare or Medicaid reimbursements. The investigation into

---

[16] In 2000, Defendant sued Nomura and ASC in the Southern District of New York for the breach of certain representations and warranties made in connection with the transfer of the Nomura Loan regarding the value of the hospital property. The district court granted summary judgment in favor of Nomura, and Defendant appealed. On appeal, the Second Circuit vacated and remanded for further proceedings the district court's grant of summary judgment on all claims save the breach of an "origination warranty" Nomura made with respect to the sale of certain mortgages to Defendant. *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, No. 00 Civ. 8720 (NRB), 2004 WL 2072501, at *1 (S.D.N.Y. Sept. 14, 2004) *aff'd in part, vacated in part, remanded by*, 424 F.3d 195 (2d Cir. 2005).

upcoding was ongoing and known to Nomura at the time of the Nomura Loan in August 1997. Nomura commissioned Coopers & Lybrand to prepare a report on Doctors Hospital's financial health. The report estimated a "best case" scenario of a $4.6 million reduction in patient revenues based on fraudulent Medicare billing practices. (Jt. Ex. 31, Tab B.) Its "worse case" was a reduction in revenues of $29 million for the twelve month period (ending July 31, 1997) covered in the report. (Tr. III: 120-22.) In 1999, Doctors Hospital agreed to pay a $4.5 million fine to the federal government to settle upcoding claims brought by the federal and state governments. ("Settlement Agreement," Jt. Ex. 161.) Desnick personally paid the entire fine. The notes to Doctors Hospital's audited financial statements for fiscal year 1999 record this legal action and settlement agreement.

The second investigation focused on kickbacks paid to Doctors Hospital physicians for medically unnecessary procedures and the hospital's inability to meet certain Medicare eligibility requirements for the period 1993-1998. In 2000, Desnick agreed to pay $14.5 million in fines to the federal government and the State of Illinois to settle the kickback and other fraud allegations. ("Settlement Agreement," Jt. Ex. 162.) Again, he personally paid the entire amount of the fine.

The bankruptcy court also noted that on February 12, 2004, Mike Wurst, a director in charge of special servicing at Orix, stated the following in a "litigation webcast," the transcript of which was admitted into evidence:

> Nomura failed, as far as we can tell, to underwrite any of the senior staff or significant physicians at the operating business, at the healthcare provider.
>
> There's no evidence of record that we've been able to locate that Nomura took into account the problems that had been created and that were being investigated at the time of the loan with respect to these individuals. Of course, we recently learned that senior executives and physicians at the hospital have been not only investigated but indicted and convicted for Medicare and Medicaid-related transgressions.
>
> Now, this is important, because 92 percent of the operating business tenant's income was derived from Medicare and Medicaid. Now, in the disclosures that were made by Desnick, there were, in fact, numerous instances of litigation that were listed.

* * *

In fact, we've subsequently learned that Doctors Hospital, the operating business tenant, was fined a total of $18.5 million for Medicare and Medicaid-related violations. Those are in two separate fines. One was $4.5 million; one was $14 million. Desnick personally paid both those fines, presumably from the proceeds of this loan.

("Litigation Webcast Transcript," Jt. Ex. 151 at 23-24.)

## VIII. Bankruptcy Court Judgment

Judge Schmetterer found that Doctors Hospital was insolvent at all times from August 28, 1997 through April 17, 2000. On Count VIII, Judge Schmetterer therefore entered judgment in favor of Plaintiff and against Defendant (a) declaring void the Guaranty, the Assignment, the Pledge and Security Agreement, and the Equity Pledge Agreement and (b) concluding that Plaintiff is entitled to recover all proceeds from the sale of assets that formed collateral associated with the voided documents.

From August 28, 1997 (the date of insolvency) through July 7, 1998, Doctors Hospital made rent payments under the HPCH Lease directly to Defendant. Judge Schmetterer found that the receipt of these payments made Defendant the payments' "initial transferee" under Section 550 of the Bankruptcy Code and that the payments were voidable to the extent they exceeded fair market value. Judge Schmetterer found, however, that rent payments to Defendant after July 7, 1998 were not made with Doctors Hospital's assets and therefore were not voidable. On Counts IX and X, he entered judgment in favor of Plaintiff for excess Lease payments in the total amount of $2,668,746.35, plus pre-judgment interest, and in favor of Defendant on Plaintiff's application to void the Lease and on the prayer for recovery of additional Lease payments. Initial Findings, 360 B.R. at 879.

Both sides have appealed. Plaintiff argues that the court erred in finding that the post-July 1998 rent payments to Defendant were not voidable as fraudulent transfers. Defendant argues that

the court erred in finding that Doctors Hospital was insolvent as of August 28, 1997 and that the pre-July 1998 transfers to Defendant were not voidable as fraudulent transfers.

**DISCUSSION**

This court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 158(a)(1), which vests the district court with jurisdiction over appeals from "final judgments, orders and decrees" issued by the bankruptcy court. The district court functions as an appellate court when reviewing bankruptcy court decisions. *Bielecki v. Nettleton,* 183 B.R. 143, 145 (N.D. Ill.1995) (citing FED. R. BANKR. P. 8013). In a bankruptcy appeal, the court examines the "bankruptcy court's factual findings for clear error and its legal conclusions de novo." *Meyer v. Rigdon*, 36 F.3d 1375, 1378 (7th Cir.1994). The bankruptcy court's findings of fact "are upheld unless they are clearly erroneous," and its legal conclusions are reviewed *de novo. In re Home Comp Care, Inc.*, 221 B.R. 202, 205 (N.D. Ill.1998) (citing *In re Lefkas Gen. Partners*, 112 F.3d 896, 900 (7th Cir.1997)). The district court may consider only the evidence presented before the bankruptcy court and made a part of the record. *Id.* at 205 n.1 (citation omitted).

**Summary of Issues On Appeal**

Defendant appeals from paragraphs 1 and 2 of the bankruptcy court's Amended Final Judgment Order and from the Claim Denial Orders. Paragraph 1 voided the August 28, 1997 Guaranty executed in connection with the Nomura Loan, and paragraph 2 awarded damages plus prejudgment interest to Plaintiff in the amount of above-market rent paid from Doctors Hospital to Defendant between August 28, 1997 and July 7, 1998. Defendant argues that (1) the bankruptcy court erred in concluding that Defendant was the "initial transferee" of the above-market transfers of rent under Section 550 of the Bankruptcy Code; (2) the bankruptcy court erred in finding the transfers to Defendant were rent rather than debt; and (3) the bankruptcy court applied improper "hindsight bias" in determining Doctors Hospital's date of insolvency and erred in awarding prejudgment interest. If this court finds that Defendant was not the "initial transferee," or that the

pre-July 1998 payments were not rent, Defendant asks the court to enter judgment for Defendant on all counts. If the court finds for Defendant on the issues of insolvency and/or prejudgment interest, Defendant requests that the court remand on the insolvency issue with instructions that the trial court adhere to a "strict application" of the "no hindsight" rule and/or conduct further proceedings on the computation of prejudgment interest, with the entry of judgment in a revised amount (if any).

Plaintiff appeals from the bankruptcy court's finding that rent transfers to Defendant after July 7, 1998 were not the property of Doctors Hospital and therefore could not be recovered as fraudulent transfers. Plaintiff asks this court to reverse the bankruptcy court's finding that the transfers to Defendant after July 7, 1998 were not transfers of Doctors Hospital's assets and to direct the bankruptcy court to enter judgment in favor of Plaintiff in the amount of $10,317,57 (the amount of the post-July 1998 transfers) and interest thereon.

For the reasons discussed below, the court affirms the bankruptcy court's judgment against Defendant on Counts VIII, IX, and X, and denies both parties' claims on appeal.

## I.    The Bankruptcy Court Did Not Clearly Err In Finding Defendant Was the Initial Transferee of the Pre-July 1998 Transfers

The Trust appeals from the bankruptcy court's finding that it was the "initial transferee" of the pre-July 7, 1998 payments from Doctors Hospital to the Cash Collateral Account.  Under Section 550 of the Bankruptcy Code, a trustee may recover as fraudulent transfers payments made to an "initial transferee" after the debtor has become insolvent, but not to subsequent or intermediary transferees who receive the payments in good faith.  Judge Schmetterer found that transfers made by Doctors Hospital to Defendant between August 28, 1997 (the date of insolvency) and July 7, 1998 were fraudulent to the extent they exceeded fair market rental value[17] and

---

[17]    The bankruptcy court found that Plaintiff presented "essentially unchallenged evidence" that Doctors Hospital's rent payments under the HPCH Lease exceeded fair market (continued...)

therefore could be recovered by Plaintiff under Section 550 through application of Section 544(b),[18]

the Code's "strong-arm" provision. Section 550 provides:

> (a)     Except as otherwise provided in this section, to the extent that a transfer is
> avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title,
> the trustee may recover, for the benefit of the estate, the property
> transferred, or, if the court so orders, the value of such property, from–
>
> > (1)     the initial transferee of such transfer or the entity for whose benefit
> > such transfer was made; or
> > (2)     any immediate or mediate transferee of such initial transferee.
>
> (b)     The trustee may not recover under section of this section from–
>
> > (1)     a transferee that takes for value, including satisfaction or securing of
> > a present or antecedent debt, in good faith, and without knowledge
> > of the voidability of the transfer avoided; or
> > (2)     any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550 (internal citations omitted). The Bankruptcy Code does not define "initial

transferee," and there is no helpful legislative history, but *Bonded Financial Servs., Inc. v. European*

*American Bank*, 838 F.2d 890 (7th Cir. 1988), provides guidance. *Bonded Financial*, the leading

---

[17](...continued)
rental value. Based on the testimony of an expert in real estate and appraisals, the court found that
the monthly fair rental value for the hospital property was $175,833.33. At the time of the
bankruptcy filing, Doctors Hospital's monthly rental payments were $760,000. Initial Findings, 360
B.R. at 876. Defendant does not dispute that the payments were in excess of fair market rental
value, nor does it challenge the bankruptcy court's finding as to what constituted reasonably
equivalent rental value.

[18]     Section 544(b) provides:

(b)(1) Except as provided in paragraph (2), the trustee may avoid any
transfer of an interest of the debtor in property or any obligation incurred by
the debtor that is voidable under applicable law by a creditor holding an
unsecured claim that is allowable under section 502 of this title or that is not
allowable only under section 502(e) of this title.

(2)     Paragraph (1) shall not apply to a transfer of a charitable contribution (as
that term is defined in section 548(d)(3)) that is not covered under section
548(a)(1)(B), by reason of section 548(a)(2). Any claim by any person to
recover a transferred contribution described in the preceding sentence under
Federal or State law in a Federal or State court shall be preempted by the
commencement of the case.

case in this Circuit (and nationally), interprets the term as requiring, at a minimum, "dominion and control" over the transferred property, or, more precisely, "the right to put the money to one's own purposes." *Id.* at 893. An initial transferee is consequently something more than the "possessor," "holder" or "agent" of the transferred funds. *Id.* at 894.

In *Bonded Financial*, the debtor sent a check to the bank with a note directing the bank to deposit the check into the account of a Michael Ryan, who had an outstanding loan with the bank. The Seventh Circuit held that the bank could not be the "initial transferee" under Section 550 because it acted merely as a financial intermediary, with no authority to use the funds until Ryan later instructed the bank to debit his account to reduce the loan. *Id.* at 893-94. To better illustrate its ruling, the *Bonded Financial* court offered a hypothetical alternative to the facts of that case:

> If the note accompanying Bonded's check had said: "use this check to reduce Ryan's loan" instead of "deposit this check into [Ryan]'s account", § 550(a)(1) would provide a ready answer. The Bank would be the "initial transferee" and Ryan would be the "entity for whose benefit [the] transfer was made."

.
*Id.* at 892. The ultimate outcome is the same—the bank receives the transferred funds as payment on the loan—but the bank's role in the transfer differs significantly. Under the hypothetical facts, the bank is the initial recipient of the funds and upon acceptance of the funds obtains the "valuable right to offset its loan against the funds in Ryan's account." *Id.* Under the actual facts of *Bonded Financial*, however, the bank is merely a financial intermediary in the initial transfer to Ryan's bank account and can receive no benefit until the account holder takes action.

Unfortunately, application of the "dominion and control" test in the two decades since *Bonded Financial* has generated some confusion. Plaintiff argues that "dominion and control" only requires that a transferee act "as more than a conduit for funds it receives" and insists that "*all* of the precedent, included *Bonded Financial* takes this approach." (Response Brief of Gus A. Paloian, as Chapter 11 Trustee, No. 07 C 2722 [Dkt. 19] (hereinafter "Pl.'s Resp.") at 4.) Defendant offers a more nuanced interpretation. Under Defendant's understanding of *Bonded Financial* and similar

cases, determining that an entity is an "initial transferee" requires a two-part inquiry: First, the court must ask whether the transferee is a "mere conduit" for the transferred funds, and if the answer is no, the court should ask whether the transferee has "dominion and control" over that funds, that is, whether it can use the funds for its own purposes. Defendant's analysis comes not from *Bonded Financial*, but from the Second Circuit, which applies a combination of *Bonded Financial's* "dominion and control" test and its own "mere conduit" test. *See In re Manhattan Inv. Fund, Ltd.*, 397 B.R. 1, 14-15 (S.D.N.Y. 2007) (citing *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 130 F.3d 52, 58 (2d Cir.1997)). The "mere conduit" test "frames [the Seventh Circuit's] 'dominion and control' test in the negative . . stating . . . that a party is *not* an initial transferee if it was a 'mere conduit' of the funds." *Id.* (court's emphasis.)

The facts of *In re Manhattan Investment Fund* illustrate the combined application of these tests. In that case, under an agreement between stockbroker Bear Stearns and the debtor fund, the fund's transfers went to the fund's account at Bear Stearns for the purpose of opening and maintaining short trading positions.[19] Bear Stearns was not a mere conduit: Once the funds were deposited, Bear Stearns did not have to respond to any directions from the fund; it was not required to return any money while the fund had open short positions; and it had the authority to use those funds to close out the fund's short positions at any time. *Id.* at 17. As a broker, however, Bear Stearns was limited to some degree in the actions it could take with respect to the funds. Under the SEC Rules, it could not, for example, use the funds in its own investing or for "proprietary" purposes. *Id.* at 18 (citing SEC Rule 15c3-3(e)(2). Weighing Bear Stearns's substantial control

---

[19] A "short position" refers to the practice of "short selling"—a kind of speculative transaction where "a security not owned by the seller is sold in the hope that the price of the security will decline, permitting the seller to later repurchase the security ('cover') and make a profit. Typically, the seller borrows the security to be sold short from his broker and covers by later buying the identical stock and transferring it to his broker." *In re Manhattan Inv. Fund*, 397 B.R. at 4 n.3 (quoting *Bear, Stearns Securities Corp. v. Gredd,* No. 01 Civ. 4379 (NRB), 2001 WL 840187, at *1 (S.D.N.Y. July 25, 2001)).

over the funds against the limitations imposed by the SEC, the Second Circuit interpreted "the ability to use the funds for its own purposes" not as the ability to use funds for *any* purpose but simply the ability to use them for one's own benefit. Bear Stearns was, thus, an "initial transferee" under Section 550. *Id.* at 18-19. The court explicitly rejected the broad language of *Bonded Financial* suggesting that the "dominion and control" test is met only where the transferor has absolute freedom to invest transfers, be it in "lottery tickets or uranium stocks." *Id.* at 18 (quoting *Bonded Financial*, 838 F.2d at 894). The court analogized the relationship between Bear Stearns and the fund to that of a creditor and debtor: "Although the purpose of the transfers was not to repay a loan *per se*, the transfers ensured that Bear Stearns would never be in a position to need repayment." And, as the court noted, "[c]reditors receiving loan payments are frequently deemed to be initial transferees." *Id.* at 19 (citing cases). This "economic protection," combined with Bear Stearns's ability to retain the funds or to use them to close debtor's short positions, made it clear to the court that "the transfers were held for Bear Stearns's 'own purposes.'" *Id.*

Application of the "initial transferee" doctrine in this case is challenging. Pursuant to the terms of the HPCH Lease, Doctors Hospital made rent payments to Defendant's Cash Collateral Account from August 28, 1997 until July 7,1998; as Nomura's successor in interest and assignee of the HPCH Lease, Defendant applied these funds to the outstanding Nomura Loan debt. Defendant does not argue that it was a "mere conduit" under these facts. Rather, it urges this court to recognize that a transferee may exercise a degree of control over transferred funds greater than a mere conduit and yet still not be an "initial transferee." Defendant's case rests on the following contentions: Defendant did not have an "economic interest" in the Nomura Loan and therefore its repayment could not have benefitted Defendant. In any event, the application of the transferred funds to reduce HPCH's debt under the Loan was not within the Trust's "dominion and control"; that is, it was not done "for its own purposes." (Opening Brief of LaSalle National Bank National Association, As Trustee No. 07 C 2722, [Dkt. 23] (hereinafter "Def.'s Br.") at 17.)

32

The court considers, first, Defendant's claim that it did not have an economic interest in the Nomura Loan's repayment. Defendant points out that the Trust was not Nomura's true successor-in-interest and therefore repayment of the Nomura Loan could not constitute repayment of Defendant's own loan. (Def.'s Br. at 24; Reply Brief of LaSalle Bank National Association, as Trustee, No. 07 C 2722 [Dkt. 23], (hereinafter "Def.'s Reply") at 14-15.) Judge Schmetterer was not persuaded, and neither is this court. Though the Trust was not the original lender under the Nomura Loan, the terms of the Pooling and Service Agreement ("PSA"), particularly its designation of the Trust as owner of the Nomura Loan, make clear that Defendant was indeed Nomura's successor-in-interest. Defendant's rights and duties under the PSA do not, as Defendant contends, reflect the creation of a disinterested "pass-through" entity or conduit, but rather a business dedicated to administering and enforcing the Trust's loans, including the Nomura Loan. The PSA identifies the Trust itself as the owner of the Nomura Loan and intended recipient of the disputed transfers, and the Trustee (LaSalle Bank, acting on behalf of ASC's certificateholders), through the Trust's Servicer and Special Servicer (AMRESCO or Orix, AMRESCO's successor in interest), as holding the duties of operating and managing the Nomura Loan. (PSA, Jt. Ex. 23 at 64-65.)

As the bankruptcy court found, the Trust's duties encompassed "all duties that an owner of a mortgage loan would perform," including "collection of taxes and assessments, maintenance of various escrow account (*sic*) and other bank account (*sic*), making withdrawals from those account (*sic*), investing funds, maintaining insurance policies, enforcing 'due-on-sale' clauses, obtaining appraisals of mortgaged properties, agreeing to modification of mortgages, collecting fees, and inspecting properties." Initial Findings, 360 B.R. at 845; Additional Findings, 373 B.R. at 71. Under certain circumstances described in the PSA, the Trustee, the Servicer, and the Special Servicer even had the right to make advances to Trusts' certificateholders. (PSA, Jt. Ex.23 at 171-74.) The Trust's certficateholders, by contrast, "had no rights with respect to the operation and management of the Trust Fund and had no liability for the actions of the Trustee, Servicer or Special Servicer or

any other party to the [PSA]." Initial Findings, 360 B.R. at 844-45. (*See* PSA, § 10.02, "Limitations on Rights of Certificateholders," Jt. Ex. 23 at 222.) The Trustee, not the certificateholders, brought suit against Nomura and is defending the Trust in the instant action. *Id.* The Trustee and its Servicer and the Special Servicer (Orix) were also entitled to receive fees in return for services performed in administering and enforcing the Trust's assets. Additional Findings, 373 B.R. at 71-72; Initial Findings, 360 B.R. at 844-45. Finally, pursuant to the Nomura Loan and the HPCH Lease Assignment, the Trust alone had the ability to apply transfers to the Cash Collateral Account to the outstanding Nomura Loan debt. Additional Findings, 373 B.R. at 72-73. Given the breadth and substance of Defendant's duties, the court agrees with Judge Schmetterer that Defendant had a financial interest in the transfers. *See* Initial Findings, 360 B.R. at 845.

Defendant's economic interest in repayment of the Nomura Loan does not, however, automatically equate with "dominion and control" over the transferred funds. Indeed, Defendant does not dispute the finding that it had "physical control" over the Cash Collateral Account, but nevertheless contends that the breadth of its control did not amount to that contemplated by *Bonded Financial.* (*See* Def.'s Br. at 24.) According to Defendant, its control of the Cash Collateral Account extended no farther than "the ability to prevent someone else from exercising control over the property," a characteristic shared by all intermediaries. (Def.'s Br. at 14.) As this court reads the bankruptcy court's opinion, however, the court did not rely solely on Defendant's control of the Cash Collateral Account in concluding that it had both the economic incentive and the ability to use the funds for its own purposes. As assignee of the Nomura Loan, which includes control over the Cash Collateral Account, Defendant held the right both to collect transfers of rent and to use them to reduce HPCH's debt under the Nomura Loan. (Jt. Ex. 89 ¶ 2.) Doctors Hospital paid rent into the Cash Collateral Account, "over which HPCH [its landlord] had no dominion or control." *Id.* The Trust then applied the rent payments to HPCH's debt pursuant to the terms of the HPCH Lease, the Nomura Loan, and the Lease Assignment. *Id.* The bankruptcy court explicitly found that this

relationship with Doctors Hospital made Defendant more than a conduit for the transferred funds and, like the court in *In re Manhattan Inv. Fund*, suggested that the relationship was akin to that of a debtor and creditor. *See* Additional Findings, 373 B.R. at 73 (quoting *In re Toy King Distributors, Inc.*, 256 B.R.1, 146 (Bankr. M.D. Fla. 2000) ("When the transferee is a creditor, or has a business relationship with the debtor, and it receives a transfer that is applied to its own debt, the transferee cannot be a conduit.")). As sole owner of the Cash Collateral Account, Defendant alone had the right both to receive rent payments owed under the HPCH Lease and to make withdrawals to repay HPCH's debt. That Judge Schmetterer characterized the Doctors Hospital's transfers as "rent" rather than "debt" payments does not alter the fact that Defendant, not HPCH, controlled the Cash Collateral Account and, with it, the exclusive authority to apply the transferred funds to HPCH's debt.

Defendant emphasizes the Seventh Circuit's broad language in *Bonded Financial*, noting that Ryan, the "initial transferee" in that case, "was free to invest the [funds] in lottery tickets or uranium stocks," until he directed the bank to apply the transfers in his account to his outstanding debt with the bank. (Def.'s Br. at 14 (quoting *Bonded Financial*, 838 F.2d at 893-94.)) But Judge Easterbrook's colorful dicta does not mean that the "dominion and control" test is satisfied only if the transferee has carte blanche to use the funds however it sees fit. Since *Bonded Financial*, courts have repeatedly held that one can have the freedom to use funds "for one's own purposes" even without being entitled to use funds "for any purpose." As the court in *In re Manhattan Investment Fund* noted, in accordance with similar cases in other circuits, "a party can be an initial transferee even if it cannot use received funds for endeavors unrelated to the underlying transaction." 397 B.R. at 18. In that case, Bear Stearns did not personally profit from its use of the funds, but so long as short positions were open, the ability to "control and direct" the transfers—in particular, the ability to close out those short positions at any time—rested entirely within its power. *Id.* at 21.

35

Similarly, *In re Incomnet, Inc.*, 463 F.3d 1064, 1071-73 (9th Cir. 2006), cited by both parties, applied the "dominion and control" test set out in *Bonded Financial* and concluded that an "initial transferee" may retain that status even if subject to certain restrictions in exercising its dominion over transferred funds. The transferee in *Incomnet* was the Universal Service Administrative Company ("USAC"), a nonprofit corporation to which the Federal Communications Commission delegated responsibility for collecting and disbursing funds to support universal telecommunications (e.g., high-speed internet) service pursuant to the Telecommunications Act of 1996. USAC was permitted to spend the funds only "for designated, highly regulated purposes," which consisted of disbursal to the fund's beneficiaries. Nonetheless, the court concluded that USAC had dominion over the funds in question because it decided "if, when, and how" it disbursed the funds to beneficiaries. *Id.* at 1071-72. The court also found significant the fact that the transferee, like Defendant here, held legal title to the transferred funds, though it was careful to note that legal title and the right to use funds are not synonymous. *Id.* at 1073-74. In the case before this court, Defendant had both legal title of the funds and legal dominion to the extent it could use them to pay down HPCH's debt on the Nomura Loan, a use that, as discussed above, benefitted Defendant as the successor to Nomura. As in *Incomnet*, the fact that it did not have plenary discretion to "purchase lottery tickets or uranium stocks" does not defeat the conclusion that it was an initial transferee. *Id.* at 1075-76.

Defendant attempts to distinguish *Incomnet* on the ground that USAC did not share a "binding legal relationship" with the beneficiaries of the funds, whereas Defendant owed a fiduciary duty as a REMIC Trust[20] to the Trust's certificateholders. (Def.'s Reply at 12.) The existence of a

---

[20]     The Seventh Circuit has defined "REMIC" as follows:

A real estate mortgage investment conduit ("REMIC") is a "mortgage securities vehicle authorized by the Tax Reform Act of 1986 that holds commercial and residential mortgages in trust, and issues securities representing an undivided

(continued...)

binding legal relationship, though important to the *Incomnet* court, was not dispositive. The absence of a provision naming specific beneficiaries from the statute governing USAC's administration of the funds was just one factor the court weighed in arriving at its holding, along with USAC's right "to use the money collected to accomplish the purposes of the fund" and its discretion in when and how it disbursed the funds. *In re Incomnet*, 463 F.3d at 1073. Moreover, as noted below, there is no evidence in the record that Defendant fulfilled its obligation as the administrator of a REMIC Trust by passing through debt service payments to its certificateholders prior to July 1998. *See* Initial Findings, 360 B.R. at 70.

In light of Defendant's economic interest in and exclusive dominion over the transferred funds and in the absence of any evidence it acted as a REMIC Trust before July 1998, the bankruptcy court did not clearly err in concluding that Defendant was the initial transferee of the pre-July 1998 transfers.

## II. The Bankruptcy Court Did Not Clearly Err In Finding that the Post-July 1998 Transfers Were Not Fraudulent Transfers

Plaintiff appeals from a single finding of the bankruptcy court: that the post-July 7, 1998 transfers to the Trust belonged not to Doctors Hospital but to its wholly-owned subsidiary MMA Funding.[21] The bankruptcy court found that these transfers could not be recovered as fraudulent

---

[20](...continued)
interest in these mortgages . . . . similar to a collateralized mortgage obligation (CMO) . . . ."

*United States v. Lopez*, 222 F.3d 428, 435 n.8 (7th Cir. 2000) (quoting Barron's Business Guide Dictionary of Banking Terms 497). Being classified as a REMIC would "exempt the Trust from federal income tax at the pool level." *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 201 (2d Cir. 2005).

[21]     In the its opening brief, Plaintiff stated that it also appealed from the bankruptcy court's refusal to void the HPCH Lease, but put forth no argument on this issue either in the opening brief or in its reply brief. (Opening Brief of Gus A. Paloian, as Chapter 11 Trustee, No. 07 C 05232 [Dkt. 14] (hereinafter "Pl.'s Br.") at 31. The court therefore addresses only the issue of the post-July 1998 transfers.

transfers because they were not made with funds owned by Doctors Hospital. Initial Findings, 360 B.R. at 847. Plaintiff advances four theories as to why the court erred. The first three of these theories posit that MMA Funding was never the "true borrower" under the Daiwa Loan Agreement, despite the Agreement's clear terms to the contrary. Alternatively, Plaintiff's fourth theory urges that even if MMA Funding was the borrower under the Daiwa Loan, the transfers were nonetheless property of Doctors Hospital because all transferred funds were rent payments from Doctors Hospital to the Trust.

### A. The Parties' Post-Agreement Conduct Did Not Modify the Terms of the Daiwa Loan Agreement

In its Initial Findings and Conclusions, the bankruptcy court held, and the parties agree, that New York law governs the Daiwa Loan Agreement. Additional Findings, 373 B.R. at 60. Plaintiff contends, however, that the bankruptcy court applied the wrong New York state law standard to the facts. Specifically, Plaintiff argues that the parties to the Daiwa Loan Agreement modified the Agreement's terms through their post-agreement course of conduct by substituting Doctors Hospital as the borrower. Put another way, the parties treated Doctors Hospital as the true borrower under the terms of the Daiwa Loan Agreement and in so doing, modified the Agreement's terms, which identify MMA Funding as the borrower. The bankruptcy court rejected this argument and, applying New York law, concluded that MMA Funding was the borrower both under the unambiguous terms of the Agreement and as reflected by the parties' actual conduct.

Plaintiff urges that the bankruptcy court's analysis confuses contract modification with contract interpretation. In support, Plaintiff points to a section of the bankruptcy court's Additional Findings and Conclusions of Law in which the court observed that the terms of the Daiwa Loan Agreement are unambiguous in identifying MMA Funding as the borrower. *See* Additional Findings, 53 B.R. at 58. Plaintiff does not challenge the court's observations, but instead argues that the court erred in concluding that under New York law, it was therefore barred from considering course-

of-conduct evidence that Doctors Hospital was the true borrower. (Pl.'s Br. at 33-38.) The "correct" standard, Plaintiff argues, appears in the bankruptcy court's hearing denying the Trust's motion for summary judgment. In that pretrial ruling, Judge Schmetterer had recognized that under New York law "a written contract may be modified by the parties' post-agreement course of performance" and that "[p]arol evidence can be considered to determine course of dealing and course of performance between parties." *In re Doctors Hosp. of Hyde Park, Inc.*, 336 B.R. 357, 366 (Bankr. N.D. Ill. 2005) (citations omitted). According to Plaintiff, this statement represents the "law of the case" and should have been applied at trial and in the bankruptcy court's post-trial Findings of Fact and Conclusions of Law. (Plaintiff's Br. at 34-36.) Had the bankruptcy court applied this standard, Plaintiff insists, it would have held that the parties' post-agreement course of conduct changed the borrower under the Loan Agreement from MMA Funding to Doctors Hospital.

This court is unpersuaded that the "law of the case" doctrine applies here. In denying summary judgment to Defendant on this issue, Judge Schmetterer did note that under certain circumstances, New York law permits the court to consider extrinsic evidence of contract modification through the parties' course of performance. *In re Doctors Hosp. of Hyde Park, Inc.*, 336 B.R. at 366 (citing *Gen. Elec. Capital Comm. Auto. Fin., Inc. v. Spartan Motors, Ltd.*, 246 A.D.2d 41, 52, 675 N.Y.S. 2d 626, 634 (N.Y. App. Div. 1998); *see also Big Tree Energy Partners v. Bradford*, 219 A.D. 2d 27, 640 N.Y.S. 2d 270 (N.Y. App. Div. 1996). For the doctrine of "law of the case" to apply and bind the court at trial, however, the court must actually decide the issue in question. *See Univ. Guar. Life Ins. Co. v. Coughlin*, 481 F.3d 458, 462 (7th Cir. 2007); 18B WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE § 4478 (3d Ed. 1998). The bankruptcy court did not rule on the merits of Plaintiff's claim of contract modification at summary judgment, but properly allowed that issue to proceed to trial, contract modification being a classic "fact" question. *See, e.g., Household Fin. Servs., Inc. v. Coastal Mortgage Servs., Inc.*, 152 F. Supp. 2d 1015, 1022 (N.D. Ill. 2001) (denying summary judgment on the issue of contract

modification). The "law of the case" doctrine therefore does not apply to bind the bankruptcy court to its pretrial statements regarding New York law.

In any event, the bankruptcy court's post-trial application of New York law does not contradict its earlier conclusion that it is sometimes appropriate to consider extrinsic evidence of post-agreement contract modification. Under New York law, parties may modify a contract "by another agreement, by course of performance, or by conduct amounting to a waiver or estoppel." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003) (quoting *CT Chems. (U.S.A.) Inc. v. Vinmar Impex, Inc.*, 81 N.Y. 2d 174, 597 N.Y.S. 2d 284, 613 N.E.2d 159, 162 (N.Y.1993)). Further, as Plaintiff correctly notes, even a written loan agreement with a provision requiring all modifications to be in writing, such as the Daiwa Loan Agreement, may be modified by the parties' course of performance. *S. Fed. Sav. & Loan Ass'n. of Georgia v. 21-26 E.105th Street Assocs.*, 145 B.R. 375, 380-81 (S.D.N.Y. 1991). The exception to the general rule against post-agreement modification applies in two circumstances. The first allows for the enforcement of an oral modification to the original agreement, "when there has been partial performance of the agreement to modify" and "the partial performance is 'unequivocally referable to the oral modification.'" *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990) (applying New York law). The second invokes the doctrine of equitable estoppel, allowing enforcement of a modification "when one party has induced the other party to rely on an oral modification." *Id.*

Crucial to both the "partial performance" and "equitable estoppel" exceptions is the existence of a separate oral agreement inconsistent with the terms of the original agreement. *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003) (noting that under New York law contract modification requires proof of a separate modifying agreement, including mutual assent to its terms). *Towers Charter*, cited by the bankruptcy court, involved alleged oral modifications to a loan and escrow agreement that contained a clause stipulating that all

40

modifications or waivers of contract terms must be in writing. 894 F.2d at 522. The appellant borrower claimed that it had partially performed under an alleged oral modification to the original loan agreement and that the lender should be equitably estopped from strictly enforcing the original contract terms "for having lulled [borrower] into believing that strict compliance with the contract terms was unnecessary." *Id.* The court affirmed the dismissal below of the appellant's claim for anticipatory breach of the loan agreement on grounds that the conduct cited was "entirely consistent with the agreements as written," and therefore was not "unequivocally referable to the alleged modifications." *Id.*

Plaintiff insists that New York law does not require the existence of an oral agreement in order to effect modification through course of performance. (*See* Pl.'s Br. at 38-40.) *Towers Charter* is "off point," Plaintiff contends, because it addressed "*post-modification* conduct to see if it was consistent with the purportedly modified agreement," whereas this case involves a course of performance that modified the original agreement without the existence of a separate, modifying oral agreement. (Pl.'s Br. at 39 (emphasis in original).) Yet the very precedent Plaintiff cites affirms the principle that contract modification requires a separate, modifying agreement, with course-of-performance conduct introduced only to help prove its existence:

> [W]hile partial performance may be used to prove an oral agreement where it is alleged that an oral agreement was made, there must be an oral agreement to alter the written contract: Otherwise, the fact that the parties acted in a manner inconsistent with the terms of the written contract is not sufficient to alter those terms in the face of a contract provision that all alterations must be in writing.

*S. Fed. Sav. and Loan Ass'n of Georgia v. 21-26 East 105th Street Assocs.,* 145 B.R. 375, 381 (S.D.N.Y.1991) (quoting *Grandonico v. Consortium Communications Intl., Inc.*, 566 F. Supp. 1288, 1291 (S.D.N.Y.1983)). In *Southern Federal*, the lender bank declined to assert its right to interest payments from debtors under the loan agreement, instead deducting interest owed by debtors from the construction costs it had agreed to advance under the loan. The debtors offered this conduct alone as evidence of a modification of the original contract, which, like the Daiwa Loan Agreement,

provided that all modifications must be in writing. The court held that this conduct by itself, without any evidence of a separate verbal agreement, was insufficient to modify the original contract. Instead, as the Second Circuit has noted, "fundamental to the establishment of a contract modification is proof of each element requisite to the formulation of a contract, including mutual assent to its terms." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003) (quoting *Beacon Terminal Corp. v. Chemprene, Inc.,* 75 A.D.2d 350, 354, 429 N.Y.S. 2d 715, 718 (1980)). In other words, the parties' course of performance may help prove the existence of a modifying agreement, but course of performance alone is not enough to modify an agreement.

This is exactly the reasoning the bankruptcy court applied here in rejecting Plaintiff's contract modification argument. Contrary to Plaintiff's assertions, the court did not refuse to consider the parties' course of performance simply because the contract is unambiguous. (*See* Reply Brief of Plaintiff, Gus. A. Paloian, as Chapter 11 Trustee, No. 07 C 05232, [Dkt. 24] (hereinafter "Pl.'s Reply") at 11-12.) Rather, the court's finding that the Loan Agreement was unambiguous bolstered its previous conclusion that it would be inappropriate to consider any post-agreement conduct in interpreting the clear terms of the contract. 360 B.R. at 847-49. Before addressing the issue of contract interpretation, the court found that "the evidence did not establish that any representative of either party to the loan transaction orally agreed or even proposed to modify the loan documents to change the borrower." Based on this finding, Judge Schmetterer properly concluded that the facts of this case do not fit into either of the narrow exceptions to the general principle that a contract requiring modifications to be in writing generally cannot be changed by other means. *S. Fed. Sav. and Loan Ass'n*, 145 B.R. at 380. Because neither of the two narrow exceptions permitting the consideration of unwritten, post-agreement modification applies, the parties' course of conduct is relevant only in the context of interpreting the Loan Agreement's terms. Plaintiff does not dispute that the Loan Agreement is unambiguous on its face, or that its terms name MMA Funding as the borrower. Judge Schmetterer thus correctly applied the principle that

42

"[i]f a contract is unambiguous on its face, a court must give effect to the contract as written and may not consider extrinsic evidence to evince the parties' intentions." *In re MarketXT Holdings Corp.*, 336 B.R. 39, 58 (Bankr. S.D.N.Y. 2006). Judge Schmetterer applied New York contract modification principles to the evidence before him, properly concluded that those principles did not apply to that evidence, and held that, as set forth in the unambiguous terms of the Loan Agreement, MMA Funding was the true borrower.

Plaintiff's related argument, that the court improperly excluded course-of-conduct evidence, also fails. Section 8.4 of the Daiwa Loan Agreement contains standard language requiring that any modification of its terms be in writing:

> Section 8.4. <u>Modification, Waiver in Writing</u>. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, the Note or any other Loan Document, or consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to or demand on Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

Additional Findings, 373 B.R. at 62. Plaintiff insists that, even where an agreement contains a written modification clause, New York law does not require evidence of a separate oral agreement to modify a contract through course of performance. None of the cases Plaintiff cites support this proposition, however. In *Pinky Originals, Inc. v. Bank of India*, No. 94 CIV. 3568, 1996 WL 603969, at *16 (S.D.N.Y. 1996), for example, the court merely noted that partial performance of an oral agreement to modify may be effective despite the existence of a clause requiring modification in writing, so long as the oral modification is inconsistent with the original agreement. *Southern Federal*, also cited by Plaintiff, actually supports the bankruptcy court's holding on this issue. In that case, discussed above, the plaintiff argued that the parties' course of conduct had modified the original agreement containing a written modification provision. As in *Pinky Originals*, the court recognized two exceptions to the standard rule that an agreement containing such a provision may

not be modified by course of conduct. The plaintiff in *Southern Federal* had failed to present any evidence of a verbal agreement supported by mutual consideration, however, and the court noted that "the conduct itself cannot produce a modification of the contract." It can "at best be evidence of 'an agreement based upon consideration' between both parties to modify the existing contract." *S. Fed. Sav. and Loan Ass'n*, 145 B.R. at 381 (quoting *Nassau Trust Co v. Montrose Concrete Prod.*, 56 N.Y.2d 175, 184, 451 N.Y.S. 2d 663, 667, 436 N.E.2d 1265, 1269 (N.Y. 1982)); *see also Seven-up Bottling Co. (Bangkok) v. Pepsico, Inc.*, 686 F. Supp. 1015, 1022-24 (S.D.N.Y. 1998) (recognizing that a written agreement may be modified by course of conduct but declining to find such a modification where there was no evidence that parties' conduct repudiated or contravened plaintiff's written contractual obligations and where parties had made several written modifications to the original contract); *cf. Rosen Trust v. Rosen*, 53 A.D.2d 342, 351, 386 N.Y.S. 2d 491, 499 (N.Y. App. Div. 1976) (holding contract had been modified by subsequent oral agreement where corroborated by testimony that parties had acted in accordance with the modifying agreement).

The bankruptcy court determined that the parties acted "in accordance with the transaction documents" throughout the life of the Daiwa Loan. That finding is supported by evidence that the parties did comply with the provision requiring that any modification to the Loan Agreement be in writing. Additional Finding, 373 B.R. at 63. Specifically, MMA Funding and Daiwa, the only signatories to the Daiwa Loan Agreement, modified the Loan Agreement on three occasions in accordance with Section 8.4's requirements for written modification and never sought to memorialize any oral or "course of conduct" understandings extrinsic to the Loan Agreement. Additional Findings, 373 B.R. at 62; 360 B.R. at 802, ¶ 74. (*see* Jt. Exs. 2, 3, 4.) These amendments, entered into on August 21, 1997, August 26, 1997, and February 25, 1999, did not reflect any change in MMA Funding's designation as the borrower under the Daiwa Loan and in fact ratified and confirmed the original Loan Agreement, each time redefining it only to the extent called for by the particular amendment. (*see* Jt. Ex. 2, ¶ 2; Jt. Ex. 3 ¶ 2; Jt. Ex. 4, ¶¶ 6-7.) The parties

could have included in these amendments terms modifying the original agreement identifying MMA Funding as"borrower" under the Daiwa Loan, and chose not to do so.

In short, the bankruptcy court did not clearly err in finding that MMA Funding was the borrower under the Daiwa Loan Agreement and properly applied New York law in concluding that the parties' post-agreement course of conduct did not modify the terms of the Daiwa Loan Agreement.

**B.      The Daiwa Transaction Was Not in Substance a Loan to Doctors Hospital**

Plaintiff next argues that the Daiwa transaction functioned in substance as a loan to Doctors Hospital and not to MMA Funding.  Plaintiff's argument rests on the assumption that the trial court ignored the substance of the Daiwa Loan transaction by refusing to look beyond the face of the transaction documents when making its Initial and Additional Findings of Fact and Conclusions of Law.  If the court had looked beyond those documents, Plaintiff agues, it would have concluded that Doctors Hospital's contribution of its healthcare receivables to MMA Funding was not a "true sale" because MMA Funding did not offer any valuable consideration in exchange.  (*See* Pl.'s Brief at 41.)

**1.      MMA Funding Functioned as a Special Purpose Entity**

MMA Funding was created to facilitate the Daiwa Loan as a special-purpose, bankruptcy-remote entity intended to protect Daiwa as lender from the bankruptcy risk of the operating company, Doctors Hospital.  This loan structure, called a securitization transaction, isolates the financial assets of the special purpose entity in the event that the operating company files for bankruptcy.  *See* Initial Findings, 360 B.R. at 847-48 (citing Thomas E. Plank, *The Security of Securitization and the Future of Security*, 25 CARDOZO L. REV. 1655, 1660-62 (2004)).  The structure enabled Daiwa to advance to MMA Funding monies ultimately destined for Doctors Hospital without the risk that MMA Funding's assets would be subject to creditors' claims in the event of Doctors Hospital's bankruptcy.  *Id.*  A securitization transaction permits the transfer of an operating

company's receivables to the special purpose entity in what is known as a "true sale."  A true sale converts the receivables into securities for the loan and thus isolates the risk associated with the performance of the receivables from the risk associated with the transferor company's operations. *Id.* Creation of a special purpose entity, and the transfer of receivables in a true sale, may enable an operating company to obtain a loan at a lower interest rate than would otherwise be available to it. *See Id.*

Plaintiff challenges the finding that MMA Funding was maintained as a special purpose entity, citing a laundry list of "covenants" identified in Professor Plank's article that are not applicable to MMA Funding. *See* Thomas E. Plank, *The Security of Securitization and the Future of Security*, 25 CARDOZO L. REV. 1655 (2004).  (Pl.'s Br. at 43.)  As Defendant correctly notes, however, this list applies only to securitization transactions rated by Standard & Poor's ("S&P"). There is no indication in the trial record that S&P rated the Daiwa Loan securitization. (Response Brief of Defendant LaSalle Bank National Association, as Trustee, No. 07 C 05232 [Dkt. 20] (hereinafter "Def.'s Resp.") at 35.)  Nor does the article anywhere assert that the failure to observe one or more of these covenants would require a court to disregard a special purpose entity.

Plaintiff points to evidence that Doctors Hospital performed certain operations required of MMA Funding and notes that Doctors Hospital's books and records refer to Doctors Hospital as the borrower and party liable on the loan.  (Pl.'s Br. at 42-43.)  Plaintiff avers that Judge Schmetterer did not weigh this evidence or other evidence that MMA Funding was not the true borrower under the Daiwa Loan.  To the contrary, however, the facts Plaintiff cites were in fact reviewed and rejected, twice, by the court below as a basis for finding that MMA Funding did not fulfill its function as a special purpose entity. *See* Additional Findings, 373 B.R. at 59; Initial Findings, 360 B.R. at 852.  Thus, Judge Schmetterer explicitly found that MMA Funding did not maintain separate balance sheets or profit-and-loss statements after the closing of the Daiwa Loan and that it never filed tax returns.  Initial Findings, 360 B.R. at 803, ¶ 94.  He also found that Doctors Hospital's

46

financial statements for fiscal years 1997, 1998, and 1999 stated that Doctors Hospital "maintains a revolving line of credit arrangement pursuant to a Loan and Security Agreement dated March 31, 1997" (the Daiwa Loan) and that all of Doctors Hospital's accounts receivable were listed as assets pledged as collateral to secure this line of credit. *Id.* ¶ 98. Finally, the bankruptcy court found that on at least one occasion, borrowing base certificates in the name of MMA Funding had been submitted to Daiwa on Doctors Hospital's letterhead, in spite of a requirement in MMA Funding operating agreement to maintain separate stationary. *Id.* ¶ 96. Judge Schmetterer nonetheless concluded that MMA Funding functioned throughout the life of the Daiwa Loan as a special purpose entity:

> MMA Funding was not an operating company. Robinson (the manager of Doctors Hospital) acknowledged that it was never intended to be an operating company. (Tr. II, p. 24.) However, its lack of operations (and functions related to operations) does not mean that its corporate form should be ignored. In the same way, the absence of separate financial statements and tax returns for MMA Funding after the closing date of the Daiwa Loan do not warrant disregarding the separateness of Doctors Hospital and MMA Funding.

*Id.* at 852. While the quoted language appears in the bankruptcy court's analysis of Plaintiff's alter ego theory, its conclusions are no less relevant in determining whether MMA Funding was maintained as a separate, special purpose entity. The bankruptcy court looked at the intent of the parties in structuring the Daiwa Loan transaction and concluded that all parties, including Plaintiff, intended and indeed relied upon MMA Funding's separateness as a condition for the loan. In light of the parties' reliance on MMA Funding as the "documented borrower" under the unambiguous transaction documents, the court properly dismissed as irrelevant the fact that the parties involved in the Daiwa Loan transaction may or may not have "*treated* Doctors Hospital as the borrower" or that Doctors Hospital may have regarded itself as the true borrower. *Id.* at 849 (bankruptcy court's emphasis). The primary purpose of MMA Funding, the purpose that all parties involved in the transaction ratified and relied upon, was to place certain assets beyond the reach of Doctors Hospital's bankruptcy, and the trial court did not clearly err in finding that it had fulfilled that

47

purpose.

The bankruptcy court made several additional factual findings in support of MMA Funding's function as a special purpose entity. *See id.* at 799-804, 847-49. First, it found that both Daiwa, MMA Funding, and Doctors Hospital repeatedly affirmed and relied upon MMA Funding's separate, special-purpose status when entering into the Daiwa Loan. *Id.* at 847-48. For example, the Daiwa Loan documents themselves "contained detailed covenants requiring MMA Funding to be maintained as a separate legal entity from Doctors Hospital throughout the life of the Daiwa Loan." *Id.* at 484. (Jt. Ex. 5, Ex. IV.) At the time the Loan Agreement was executed and on each subsequent funding date throughout the life of the loan, MMA Funding reaffirmed the separateness covenants in Exhibit IV to the Contribution Agreement. 360 B.R. at 849. Finally, Doctors Hospital, though not a signatory to the Daiwa Loan, nonetheless acknowledged MMA Funding's separate status when it ratified an amendment to the Contribution Agreement dated February 25, 1999. *Id.* at 849.

In addition, the bankruptcy court noted, MMA Funding submitted monthly borrowing base certificates to Daiwa, as required by Section 1.01 of the Daiwa Loan Agreement. *Id.* at 802 ¶¶ 79-82. The trial evidence included borrowing base certificates from MMA Funding to Daiwa for each of the months of August 1998 through March 1999, as well as one dated June 28, 1998. *Id.* at 802, ¶ 80, 96. Plaintiff disputes this finding. According to Plaintiff, it was Doctors Hospital who prepared and submitted the borrowing base certificates. Plaintiff cites to a written request dated June 16, 1998 for loan advances allegedly prepared by Doctors Hospital with borrowing base certificates attached. (Jt. Ex. 61.) (Pl.'s Br. at 43.) This court will only reverse a trial court's finding of fact where the finding was not in clear error. FED. R. BANKR. P. 8013. The written request, though on Doctors Hospital stationary, explicitly acknowledges that MMA Funding and Daiwa are the parties to the Daiwa Loan. (Jt. Ex. 61.) Further, as the bankruptcy court noted, the borrowing base certificate is in the name of MMA Funding and signed by two of MMA Funding's officers. Initial

Findings, 360 B.R. at 803 ¶ 96. (Jt. Ex. 61.) Based on this evidence, the bankruptcy court could reasonably conclude that MMA Funding submitted the monthly borrowing base certificates.

Most significantly, the bankruptcy court found that the Daiwa Loan parties and Doctors Hospital relied on the separate existence of MMA Funding throughout the life of the Daiwa Loan, and the record supports this finding. Correspondence among attorneys working on the Daiwa Loan reveal that Daiwa would not even have agreed to make the loan without assurance of MMA Funding's function as a special purpose entity. *Id.* at 848. (*See* Jt. Exs. 117, 168, 171.) Doctors Hospital itself benefitted from the arrangement by obtaining a loan at a lower interest rate than it otherwise would have absent MMA Funding's role as a special purpose entity. 360 B.R. at 848-49. Legal opinions delivered at the closing of the Daiwa Loan affirmed the separate existence of MMA Funding. 360 B.R. at 801 ¶¶ 62, 64. The bankruptcy court noted that the law firms of Chuhak & Tecson and Shefsky & Froelich each delivered legal opinions validating the separate legal existence of MMA Funding, and James Desnick, the owner of Doctors Hospital, issued officer's certificates in support of both opinions. 360 B.R. at 801 ¶¶ 62-65.

For the foregoing reasons, it was not clear error for the bankruptcy court to conclude that MMA Funding functioned as a separate purpose entity under the Daiwa Loan.

### 2. The Transfer of the Doctors Hospital Receivables was a True Sale

Plaintiff next argues that the transfer of the healthcare receivables from Doctors Hospital to MMA Funding was not a "true sale."[22] Plaintiff bases this argument on two premises, but the court adopts neither of them. First, Plaintiff claims that MMA Funding was a "sham" because it did

---

[22] Defendant urges that Plaintiff waived this argument by failing to raise it below. *See In re Kontrick*, 295 F. 3d 724, 734 (7th Cir. 2002) (failure to present arguments to bankruptcy court for resolution results in waiver of argument). In Plaintiff's opening statement, Plaintiff's counsel did say that he would not ask for a finding that the transfer of the receivables constituted a financed transaction rather than a "true sale." (Tr. I:p. 12:9-23.) Plaintiff did, nevertheless, address the "true sale" issue in its post-trial reply brief in response to Defendant's own argument on the matter. (Adversary Dkt. No. 557 at 20-21 n.7.) The court concludes Plaintiff did not waive the issueI.

not comply with the terms of its own operating agreement, an argument this court and the bankruptcy court have both rejected. Second, Plaintiff contends that Doctors Hospital did not actually contribute its receivables to MMA Funding after the closing of the Daiwa Loan and that, in any event, MMA Funding did not offer adequate consideration in exchange.

The bankruptcy court found that pursuant to the terms of the Daiwa Loan, Doctors Hospital transferred all its healthcare receivables to MMA Funding and that these transfers constituted a "true sale." Initial Findings, 360 B.R. at 848. The transfers were made pursuant to a Contribution Agreement signed by Doctors Hospital and MMA Funding in connection with the Daiwa Loan. *Id.* at 848. Under the Contribution Agreement, Doctors Hospital relinquished "all right, title, and interest in and to [the receivables]." *Id.* at 800 ¶ 56. Further, the Contribution Agreement structured the transfer of the receivables to occur not only on the closing date of the Daiwa Loan but on a continuing basis until termination of the Loan. *Id.* at 800 ¶ 57. The Contribution Agreement also contained multiple provisions requiring MMA Funding to exist as a separate legal entity throughout the life of the Daiwa Loan and acknowledged the transfer as a "true sale." *Id.* ¶ 53. (Jt. Ex. 5, Ex. IV.) Two years after the closing date of the Daiwa Loan, Doctors Hospital ratified the separate, special purpose status of MMA Funding in an amendment to the Contribution Agreement and again explicitly recognized the transfer of the receivables as a "true sale." *Id.* ¶ 55. And the parties complied with UCC formalities in connection with the transfer of the receivables: Doctors Hospital executed and filed a UCC-1 statement that provided for "a full and complete transfer of ownership" of the receivables to MMA Funding, and MMA Funding executed a UCC-1 statement that reflected Daiwa's security interest in the receivables. *Id.* ¶¶ 70, 71.

Plaintiff urges that transfer of the receivables nevertheless did not meet the definition of a "true sale" as described by Professor Plank in the article cited by the bankruptcy court in its Initial Findings and by both parties in this appeal. According to Professor Plank, a "true sale" requires the transferor to transfer most of the benefits and burdens of ownership:

> In the case of the transfer of receivables, this requires that the buyer receive most of the risk of loss in the market value of the receivables. [In addition], the seller must receive fair market value for the transfer of benefits and burdens of ownership and for retention of any of those risks.

Plank, 25 CARDOZO L. REV. at 1675. Plaintiff concedes, however, that Professor Plank's opinion is not binding authority on what constitutes a true sale. Courts themselves do not consider a prescribed list of factors, nor do the courts consistently assign greater weight to certain factors over others. *See In re Commercial Loan Corp.*, 316 B.R. 690, 700-01 (Bankr. N.D. Ill. 2004). *In re Commercial Loan Corp.* addressed the argument that the bankruptcy trustee for a real estate loan company had abandoned a viable claim by conceding that certain mortgage loans to a third party constituted a true sale. In holding for the trustee, the bankruptcy court noted that courts typically apply a "totality of the circumstances" test, but "different courts consider different factors and give those factors different weight." *Id.* at 700. For example, some courts rely entirely on the language of the parties' contract, whereas to others the language matters little. *See id.* One recent decision summarized the factors considered by courts as follows:

1. Language of the documents and conduct of the parties.

2. Recourse to the seller.

3. Seller's retention of servicing and commingling of proceeds.

4 Purchaser's failure to investigate the credit of the account debtor.

5. Seller's right to excess collections.

6. Purchaser's right to alter pricing terms.

7. Seller's retention of right to alter or compromise unilaterally the terms of the transferred assets.

8. Seller's retention of right to repurchase asset.

*In re Jersey Tractor Trailer Training, Inc.*, No. 06-12743, 2007 WL 2892956, at *7 (Bankr. D. N.J. Sept. 28, 2007), *aff'd by* No. ADV 06-2003, 2008 WL 2783342 (D. N.J. July 15, 2008) (citing Aicher & William J. Fellerhoff, *Characterization of a Transfer of Receivables as a Sale or a Secured*

*Loan Upon Bankruptcy of the Transferor*, 65 AM. BANKR. L.J. 181, 186-94 (1991)). Traditionally, courts have enjoyed broad discretion in ruling on whether a transaction constitutes a true sale or loan, and this case is no exception.

In making its ruling, the bankruptcy court considered the language of the Contribution Agreement and other transaction documents, the independent legal opinions, and the behavior of the parties. The bankruptcy court assigned the greatest weight to the unambiguous language of the transaction documents, particularly to the terms of the Contribution Agreement. Initial Findings, 360 B.R. at 847-48. Under that Agreement, Doctors Hospital agreed to part "with all right, title, and interest in and to the receivables." *Id.* at 848. In addition, the court considered the UCC-1 statement filed by Doctors Hospital, which stated, "[t]he Company and the Provider intend and agree that the Contribution Agreement provides for bona fide contributions and a full and complete transfer of ownership by the Provider to the Company of all Receivables." *Id.* at 848. According to the bankruptcy court, the Shefsky & Froelich opinion (not included in the record on appeal) also affirmed the parties' intent to make the transfer a "true sale" of the healthcare receivables *Id.* at 848. While a legal opinion is not dispositive, the bankruptcy court was entitled to consider it as evidence of the parties' intent to consummate a "true sale." Finally, the bankruptcy court found that following the close of the loan, Doctors Hospital again recognized the transfer of receivables as a "true sale" when it ratified the amendment to the Contribution Agreement dated February 25, 1999. 360 B.R. at 848. These factors, taken together and accorded the weight the bankruptcy court deemed appropriate within the exercise of its discretion, support a finding that the transfer of the healthcare receivables to MMA Funding constituted a "true sale."

### 3. MMA Funding was not the Alter Ego or Instrumentality of Doctors Hospital

In its Initial Findings and Conclusions, the bankruptcy court rejected Plaintiff's argument that MMA Funding should be treated as the alter ego or instrumentality of Doctors Hospital. Plaintiff

again raises this issue on appeal.

Illinois courts apply a two-part test to determine whether one corporation is the alter ego of another. First, the corporation must be "so controlled and its affairs so conducted that it is a mere instrumentality of another," and second, "the observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice." *Main Bank of Chicago v. Baker*, 86 Ill.2d 188, 205, 27 N.E.2d 94, 101 (1981); *see also Van Dorn Co. v. Future Chem. and Oil Corp.*, 753 F.2d 565, 569-70 (7th Cir. 1985). The trial court concluded that Plaintiff did not meet its burden on the second prong of this analysis and, without deciding the issue, expressed doubts as to whether Plaintiff could meet the requirements of the first prong. 360 B.R. at 852.

Plaintiff argues that it presented evidence sufficient to satisfy both prongs. First, Plaintiff contends that MMA Funding was the "mere instrumentality" of Doctors Hospital for essentially the same reasons it argued that MMA Funding was not a legitimate special purpose entity: Doctors Hospital owned and therefore controlled MMA Funding, and MMA Funding did not exist apart from Doctors Hospital because it did not maintain corporate records, file tax returns, or have its own officers or employees. The bankruptcy court was aware that Doctors Hospital owned 99% of MMA Funding and that James Desnick, the 100% owner of Doctors Hospital, owned the remaining 1%. Initial Findings, 360 B.R. at 797 ¶ 12. The bankruptcy court also effectively acknowledged that MMA Funding did not observe all corporate formalities, as it noted that the failure to observe certain corporate formalities does not automatically render a corporation the instrumentality of another, particularly where that corporation is a special purpose entity:

> MMA Funding was created as a functional vehicle and performed its intended function. Its function was to serve as a bankruptcy-remote entity and vehicle for transmission of a cash flow from it to Daiwa. The fact that it was not making widgets does not mean that its separate function should be ignored.

*Id.* at 852. As with Plaintiff's argument that MMA Funding is not a special purpose entity, the bankruptcy court carefully considered the structure and purpose of MMA Funding in light of the

Daiwa Loan transaction documents and the intent of the parties, and remained unpersuaded that MMA Funding had no separate existence from Doctors Hospital.

Plaintiff argues that it would promote injustice to permit Defendant to avoid liability for its alleged receipt of fraudulent transfers. *Id.* at 852-53. Specifically, Plaintiff contends that Defendant's predecessor, Nomura, sanctioned Desnick's looting of proceeds on the Nomura Loan, which ultimately caused the bankruptcy of Doctors Hospital, and for this reason, permitting Defendant to retain these transfers would unjustly enrich Defendant. (Pl.'s Reply at 27.) Whatever the sins of Nomura, however, "there are no allegations of intentional wrongdoing by Defendant in this case." *Id.* at 819 ¶ 220. More important, as Judge Schmetterer noted, MMA Funding "was not created as a cover for fraud or to work an injustice," but rather to protect Daiwa in the event of Doctors Hospital's bankruptcy. *Id.* at 852. As discussed above, MMA Funding was a separate corporate entity with title to its own assets, and Doctors Hospital cannot now recover those assets as its own. *See id.* at 852 (citing *In re Regency Holdings (Cayman), Inc.*, 216 B.R. 371 (Bankr. S.D.N.Y. 1998) (holding that parent could not recover loan repayments made by its subsidiary or the subsidiary of the subsidiary where "debtor did not possess legal title or any indicia of ownership of the funds")). Adhering to MMA Funding's corporate form would result only in the Trust's avoiding liability for the transfers it received, or in other words, in Plaintiff losing the case. *See id.* at 852. As the bankruptcy court correctly concluded, judgment against Plaintiff does not in itself amount to the promotion of injustice. *Id.*

Because Plaintiff failed to meet its burden under Illinois's alter ego test, the bankruptcy court did not find grounds to justify piercing MMA Funding's corporate veil—a remedy that Judge Schmetterer characterized as "reverse piercing" because here the parent company, Doctors Hospital, asserts that its own subsidiary, MMA Funding, was not really a separate entity at all. 360 B.R. at 853 (citing *In re Rehabilitation of Centaur Ins. Co.*, 158 Ill.2d 166, 632 N.E.2d 1015 (1994). Such a theory is disfavored, Judge Schmetterer noted; the remedy of corporate veil-piercing is

generally reserved for the protection of third parties rather than for the corporation itself. *Id.* (citing *Daley v. American Drug Stores, Inc.*, 294 Ill. App. 3d 1024, 691 N.E.2d 846 (1st. Dist. 1998)).

Plaintiff contends in his Reply Brief that the bankruptcy court once again misunderstood its theory and misapplied the law. Reverse piercing, Plaintiff argues, occurs only "when creditors of a shareholder are trying to reach the corporation." (Pl.'s Reply at 51 (quoting *Scholes v. Lehmann*, 56 F.3d 750, 758 (7th Cir. 1995))). In this case, Plaintiff urges, application of the alter ego theory would allow the creditors of Doctors Hospital to reach what Plaintiff asserts are Doctors Hospital's own assets. Put differently, Plaintiff's proposed alter ego claim would not require veil-piercing at all, Plaintiff urges, because it simply seeks "to have MMA Funding's purported property (the Daiwa borrowings) treated as Doctors Hospital's." (Plaintiff's Br. at 51-52.) Plaintiff cites several cases that purportedly recognize this kind of relief. *In re Jenkins Landscaping & Excavating, Inc.*, 93 B.R. 84 (W.D. Va. 1998), granted a bankruptcy creditor relief where the debtor had transferred all its assets to a successor corporation and to its principal shareholders more than a year before filing for bankruptcy. *Id.* at 88. The court held that the successor corporation, as the recipient of all the debtor corporation's assets, was the debtor's alter ego, and *based on this finding*, concluded that the successor corporation's assets constituted the property of the debtor corporation and were transferred with the intent to defraud the debtor's creditors. *Id.* at 86-88.

In the case before this court, there is no basis to conclude that MMA Funding was created solely as a means for Doctors Hospital to place its assets beyond the reach of bankruptcy creditors, as was apparently the case in *In re Jenkins*. Instead, the creation of MMA Funding mutually benefitted Daiwa and Doctors Hospital by facilitating the execution of the Daiwa Loan. Similarly, in *In re Fisher*, No. 03-33161, 2006 WL 1452498, at *8 (Bankr. S.D. Ohio Jan. 20, 2006), also cited by Plaintiff, the court found that a corporation was the alter ego of the debtor, where the debtor was the corporation's sole shareholder, routinely commingled his personal funds with the corporation's, and used the corporation to fraudulently transfer funds to his lover before filing for bankruptcy. *Id.*

at *7-*9. Again, based on the finding that the corporation was the debtor's alter ego, the court concluded that the disputed transfers were fraudulent. *Id. See also Thompson Properties v. Birmingham Hide & Tallow Co.*, 839 So.2d 629, 634 (Ala. 2002) (where the court found company to be alter ego of debtor under state law, transfers made by the company constituted transfers "made by a debtor"); *Dwyer v. Meramec Venture Assocs., L.L.C.*, 75 S.W.3d 291 (Mo. Ct. App. 2002) (holding that transfer by an alter ego or mere instrumentality of debtor constitutes transfer by debtor, and reversing dismissal of creditor's fraudulent conveyance claim).

The common element ignored by Plaintiff in every one of these cases is a *preliminary* finding by the court that the subsidiary corporation is the alter ego of the debtor under the pertinent state-law test. Only after making such a finding does the court reach the question of whether to treat the alter ego's assets as property of the debtor, in effect piercing the corporate veil. In *Jenkins Landscaping*, for example, the court first concluded that the subsidiary was in fact the alter ego of the parent corporation, and then addressed the appropriateness of treating the alter ego's property as that of the bankrupt. *Id.* at 87-88. For Plaintiff to prevail under this argument, the court must first be convinced that MMA Funding is the alter ego of Doctors Hospital. Plaintiff attempts to put the cart before the horse in claiming that it need not satisfy the second prong of the alter ego test—the promotion of injustice—because it is not making a claim against MMA Funding. (Def. Br. at 51.) Because the court has not found that MMA Funding is the alter ego of Doctors Hospital, whether the relief Plaintiff seeks amounts to reverse veil-piercing, traditional veil-piercing, or something else entirely is moot.

### C. Viewing the Agreement as Written, the Post-July 1998 Transfers Were Not Made with Funds Belonging to Doctors Hospital

Finally, Plaintiff argues that even viewing MMA Funding as the true borrower under the terms of the Daiwa Loan Agreement, the transfers to the Trust were transfers of funds owned by Doctors Hospital. According to Plaintiff, the following circumstances support this theory: (1) the

56

Trust had a right only to rent payments from Doctors Hospital; post-July 1998 borrowings from Daiwa to MMA Funding that were transferred to the Cash Collateral Account therefore necessarily belonged to Doctors Hospital; (2) Doctors Hospital owned the funds transferred from the Collection Account to the Trust's Cash Collateral Account; (3) the Trust "admitted" that the post-July 1998 funds belonged to Doctors Hospital; (4) the bankruptcy court should be understood as having actually recognized that the post-July 1998 funds belonged to Doctors Hospital; and (5) the Daiwa Loan Funds belonged to Doctors Hospital both before and after the implementation of the Nomura Loan structure because Doctors Hospital required the funds to operate.  As explained below, the court finds none of these arguments persuasive.

### 1.    The Trust's Right to Receive Rent Payments Does Not Make the Cash Collateral Account Funds the Property of Doctors Hospital

Plaintiff's first argument is that because the Trust had the right to receive rent payments from Doctors Hospital, all transfers from MMA Funding to the Cash Collateral Account must be deemed the property of Doctors Hospital.  The bankruptcy court did not adopt this reasoning.  Instead, Judge Schmetterer found that under the terms of the Intercreditor Agreement and the Payment Direction Letter, MMA Funding did agree that any advances by Daiwa to MMA Funding would be paid to the Cash Collateral Account.  From this, the bankruptcy court concluded that "MMA Funding agreed to use its funds for repayment of the Nomura Loan."  Initial Findings, 360 B.R. at 846.  Specifically, the terms of the Intercreditor Agreement state that "Daiwa has been directed by [MMA Funding] and [Doctors Hospital] to remit all funds which [MMA Funding] and/or [Doctors Hospital] are entitled to receive pursuant to [the Daiwa Loan] to the [Nomura Cash Collateral Account]."  (Jt. Ex. 202 ¶ 84.)  Based on MMA Funding's status as a special purpose entity and the language of the Intercreditor Agreement, the bankruptcy court held that Doctors Hospital could not have owned funds advanced by Daiwa to MMA Funding in the post-July 1998 time frame:

> Since Doctors Hospital was not a borrower under the Daiwa Loan Agreement, Doctors Hospital was not entitled to such funds as a borrower and had no ownership interest therein. Rather, such funds were directed into the Cash Collateral Account solely by MMA Funding, the borrower under the Daiwa Loan Agreement.
> . . .
> Because the post-July 1998 rent payments were not made with funds owned by Doctors Hospital, they cannot be recovered as fraudulent transfers.

Initial Findings, 360 B.R. at 846-847. In other words, MMA Funding, the borrower under the terms of the Loan Agreement, had sole authority to direct loan proceeds from the Daiwa Loan Agreement to the Cash Collateral Fund, which then used the funds to service the Nomura Loan.

Plaintiff counters that MMA Funding's operating agreement prohibited it from repaying the Nomura Loan. The obligation to repay the Nomura Loan was that of HPCH, not MMA Funding, and as a special purpose entity, Plaintiff argues, MMA Funding was "not permitted to pay the debts of its affiliates or even incur any debt except under the Daiwa Loan Agreement." (Plaintiff's Reply at 30.) The relevant proscriptive language in MMA Funding's Operating Agreement reads in pertinent part:

> The Company will not hold itself out, or permit itself to be held out, as having agreed to pay, or as being liable for, the debts of its Affiliate, nor will it pledge any of its assets for the benefit of its Affiliates and (ii) except for the guaranties by Medical Management of America, Inc. and HPCH Partners, L.P. (the "Guaranties") and the indemnification of Lender by James Desnick, M.D. (the "indemnification") the Company will cause its Affiliates not to hold themselves out, or permit themselves to be held out, as having agreed to pay, or as being liable for, the debts of the Company.
> . . .
> The Company will not incur any debt except as contemplated by the Loan Agreement.

(Operating Agreement of MMA Funding, Jt. Ex. 174, Art. III (5), (11).) The court agrees with Plaintiff that this language prohibits MMA Funding from representing that it was liable for any of Doctors Hospital's debts. The absence of a legal obligation to repay Doctors Hospital's debts does not, however, support Plaintiff's conclusion that "even if [new transfers from Daiwa] were MMA Funding's borrowings, they had to belong to Doctors Hospital before they went to the Trust . . . ." (Pl.'s Br. at 54.) The bankruptcy court's finding that MMA Funding actually did use its funds to

repay the Nomura Loan is not a conclusion that those funds belonged to Doctors Hospital. Rather, the language of the Intercreditor Loan Agreement required MMA Funding to pay the Daiwa Loan borrowings to the Cash Collateral Account. The ultimate consequence of the Intercreditor Loan Agreement between Daiwa and Nomura was, of course, repayment of the Nomura Loan, but nothing in MMA Funding's operating agreement nor its special purpose entity status barred it from relinquishing its claims to proceeds of the Daiwa Loan funds (as it did pursuant to the Cash Flow Agreements) or otherwise prohibited the use of those funds for repayment of the Nomura Loan, once deposited in the Cash Collateral Account. (*See* "Intercreditor Agreement," Jt. Ex. 12; "Payment Direction Letter," Jt. Ex. 92.)

The Lease Agreement between HPCH and Doctors Hospital further provides that "[r]ent may be paid by way of transfer of funds by Daiwa to the Cash Collateral Account." (Jt. Ex. 73.) Plaintiff reads this provision as manifesting the parties' intent to transfer the Daiwa borrowings to Doctors Hospital so *Doctors Hospital* could make rent payments into the Cash Collateral Account. (Plaintiff's Br. at 54.) As the court reads this provision, however, it does not evidence an intent to funnel new borrowings to Doctors Hospital so much as a desire to make those funds available directly as rent payments *before* the transfer of any excess funds to Doctors Hospital. As the bankruptcy court observed, before July 7, 1998, the Daiwa Borrowings were passed through MMA Funding to Doctors Hospital, which then made transfers directly to the Nomura Cash Collateral Account; after July 7, 1998, Doctors Hospital did not have access to the cash flow until after the Trust deducted payments from the Cash Collateral Account and applied them to the Reserve Accounts. Initial Findings, 360 B.R. at 815 ¶ 192. Contrary to Plaintiff's assertions, this restructuring of the cash flow is of utmost relevance to the determination of who owned the post-July 1998 transfers. The primary purpose of the Cash Collateral Account was to "trap" cash before the disbursal of excess funds to Doctors Hospital, thereby ensuring that payments such as debt service on the Nomura Loan would enjoy priority over Doctors Hospital's operating expenditures.

*Id.* at 817 ¶ 209-210.

Plaintiff wants to ignore this change in the parties' cash flow practices, urging that there was no alteration in the ultimate "intent" of the Daiwa Loan—to provide funds for Doctors Hospital. (Pl.'s Reply at 30-31). In other words, because it was essential that the borrowings become the property of Doctors Hospital in order for the Daiwa Loan structure to function, Plaintiff reasons, the borrowings were necessarily the property of Doctors Hospital at all times and not of MMA Funding. But this argument, again, disregards the clear intent of the parties, evident in the cash flow structures of the loan transaction documents. Had the parties so chosen, Daiwa could have transferred new borrowings directly to Doctors Hospital rather than insisting on the creation of MMA Funding as a special purpose entity; similarly, the Nomura Loan transaction documents and the Cash Flow Agreements could have left the original flow of funds undisturbed, rather than creating the Cash Collateral Account and the Collection Account to route funds through the Trust before the disbursal of excess cash to Doctors Hospital. If the clear objective of the Daiwa Loan was to provide operating funds to Doctors Hospital, the intent behind the cash flow structures is no less clear. This court will not disregard that intent simply because Plaintiff insists that the end goal is the same. The bankruptcy court did not clearly err in finding that MMA Funding's payment of the Daiwa Loan proceeds to the Cash Collateral Account were not transfers of funds belonging to Doctors Hospital.

### 2. The Bankruptcy Court Did Not Clearly Err in Declining to Determine Ownership of the Collection Account Funds

Plaintiff's second argument is premised on the assumption that Doctors Hospital owned both the Collection Account funds and the Daiwa borrowings paid to the Cash Collateral Account. After July 7, 1998, the Collection Account was created at Grand National Bank to receive "miscellaneous receipts of Doctors Hospital that were not part of the Daiwa receivables borrowing base." Initial Findings, 360 B.R. at 815 ¶ 190. (Jt. Ex. 14, sec. 16.) The funds in the Collection Account were

then transferred to the Cash Collateral Account pursuant to the Collection Account Agreement among Grand National Bank, HPCH, Doctors Hospital, and Nomura. *Id.* at 815. The bankruptcy court found, and the parties do not dispute, that "[t]he sources of funds into the Cash Collateral Account were advances to MMA Funding under the Daiwa Loan Agreement, amounts received from the Collection Account, and the interest income received." *Id.* at 846. The language of the Collection Account Agreement contemplates that funds transferred to the Collection Account would include funds from both HPCH and Doctors Hospital as well as any interest accrued on funds in the account. In reality, however, the lease payments from Doctors Hospital were HPCH's only income; thus, Collection Account funds necessarily originated with Doctors Hospital. *Id.* at 805, ¶ 111. (Jt. Ex. 14.) From July 1998 through April 2000, Doctors Hospital deposited $3,712,818.46 in receipts from its accounts into the Collection Account, and certain funds from that account were transferred to the Cash Collateral Account. *Id.* at 818-19, ¶ 215. Plaintiff contends that $3,712,818.46 of the funds transferred from the Collection Account to the Cash Collateral Account therefore "belonged" to Doctors Hospital and were fraudulently transferred to Defendant. At trial, however, Plaintiff offered no evidence concerning ownership of funds transferred into the Cash Collateral Account, and the trial court made no specific findings as to the ownership of those funds. *See id.* at 816 ¶¶ 199, 201. More important, because the Cash Collateral Account contained Daiwa Loan advances belonging to MMA Funding as well as Collection Account funds, the debt service payments were not necessarily made using any funds originally belonging to Doctors Hospital. Indeed, as Defendant notes, those funds could very well have been part of the more than $67,242,250 Doctors Hospital was able to utilize from the Cash Collateral Account under the Nomura Loan structure. *Id.* at 853. (Jt. Ex. 158; Def.'s Resp. at 51.)

### 3. The Bankruptcy Court Did Not Clearly Err in Failing to Address Defendant's Admissions

According to Plaintiff, Defendant twice acknowledged that Doctors Hospital owned the funds transferred to Defendant after July 1998, and the bankruptcy court erred in refusing to bind Defendant to these admissions. Plaintiff points to two "admissions" by Defendant in the course of the litigation that it claims the trial court did not consider. The first comes from a paragraph in the Complaint describing the lockbox arrangements between Daiwa and Doctors Hospital as additional security for the loan:

> The substance of these lockbox agreements was to provide a mechanism through the HPCH Lease . . . whereby all loan proceeds that Doctors Hospital and/or MMA Funding was entitled to borrow under the A/R Securitization Program were sent by Daiwa directly to a lockbox controlled by Nomura. Nomura was authorized under these agreements to deduct from Doctors Hospital's loan proceeds all amounts owed to Nomura by HPCH, including principal and interest and other reserves and payments due under the Loan.

Defendant admitted this paragraph in its Answer. (Jt. Ex. 142 ¶ 55.) Plaintiff focuses on the phrase "from Doctors Hospital's loan proceeds" and argues that Defendant's admission of this paragraph demonstrates Defendant's acknowledgment that Doctors Hospital was the true borrower under the Daiwa Loan.

The second purported admission appears in the stipulated facts prepared for an evidentiary hearing on Defendant's objection to the settlement agreement between Plaintiff and Dr. Desnick:

> On March 31, 1997, an affiliate of Daiwa Bank entered into a complex loan transaction in which it, among other things, loaned money to Doctors Hospital secured by its receivables. Desnick guaranteed Doctors Hospital's obligations to the Daiwa Bank affiliate on this loan.

(Jt. Ex. 135 ¶ 30.) Again, Plaintiff argues that this stipulation expresses the intent of the parties to treat Doctors Hospital as the borrower under the Daiwa Loan, thereby making new Daiwa borrowings and transfers from the Collection Account the assets of Doctors Hospital.

Plaintiff urges that the court ignored these statements in holding that MMA Funding was the borrower under the Daiwa loan. The record plainly shows that the trial court was aware of these

statements, however, and accorded them the weight it considered appropriate. In fact, the court quoted the Trust's admission to paragraph 55 of Plaintiff's Complaint in its Initial Findings. Initial Findings, 360 B.R. at 809, ¶ 151. That Judge Schmetterer did not focus on this admission in his analysis is not evidence of his failure to consider it. He could reasonably have concluded, given that the issue was obviously disputed, that Defendant did not intend to admit that, contrary to the language in the transaction documents, Doctors Hospital was the true borrower.

With respect to the stipulation, far from ignoring its significance, Judge Schmetterer specifically addressed Defendant's motion for relief from the stipulation, and ruled that the stipulation was not binding. Rather, he chose to treat it as an evidentiary admission and permit Defendant "to explain how it came about and argue that it should not be given weight or should not be given much weight." (Tr. V: 135-36.) Defendant never did attempt to explain the stipulation, but again, Defendant clearly disputed Plaintiff's claim that Doctors Hospital , not MMA Funding, was the borrower under the Diawa Loan. Nor is there any basis to conclude that Plaintiff relied on the stipulations; it presented evidence and arguments on this precise issue. That Judge Schmetterer failed to address these "admissions" specifically is not clear error.

### 4. The Bankruptcy Court at No Time Recognized the Transferred Funds as Property of Doctors Hospital

Plaintiff also urges that the bankruptcy court itself recognized that Doctors Hospital owned the transferred funds. Plaintiff cites the analysis of the Nomura Loan structure in the bankruptcy court's Additional Findings and Conclusions. *See* Additional Findings, 373 B.R. at 65-66. As Defendant notes, however, the cited section of the analysis focuses almost entirely on payments by Doctors Hospital to the Trust *before* July 7, 1998. (Def.'s Resp. at 54.) During this period, the Trust did accept rent payments directly from Doctors Hospital to its Cash Collateral Account, and as discussed earlier, the court found that these payments did constitute fraudulent transfers. Additional Findings, 373 B.R. at 65-68. At the close of its analysis of the pre-July 1998 transfers,

the bankruptcy court specifically noted that the structure changed in July 1998 when the parties began to comply with the terms of the Cash Flow Agreements:

> For the period during which Doctors Hospital and MMA Funding complied with these requirements, it was earlier found that the transfers were not made with funds owned by Doctors Hospital and therefore were not recoverable by Plaintiff. However, for the pre-July 1998 period, during which the Cash Flow Agreements were not followed, it was found that the transfers were made with funds owned by Doctors Hospital.

*Id.* at 69.  The only mention of post-July 1998 rent payments to the Trust concerns the right of the Trust under the Lease and the Nomura Loan to take rent payments from the commingled funds in the Cash Collateral Account, which included transfers of new Daiwa borrowings and "a second and separate stream of Doctor Hospital's cash" in the form of receipts.  373 B.R. at 65.  At no point in its Initial or Additional Findings did the bankruptcy court acknowledge that Doctors Hospital owned the post-July 1998 funds.[23]

### 5.      The Bankruptcy Court Did Not Treat the Unambiguous Transaction Documents Inconsistently

Finally, Plaintiff makes a somewhat nebulous argument concerning the bankruptcy court's "inconsistent" treatment of the transaction documents.  In essence, Plaintiff argues that precisely when Doctors Hospital received funds under the transaction agreements should not affect whether the Daiwa borrowings were the property of Doctors Hospital, because the sole purpose of the Daiwa loan was to ensure that Doctors Hospital received necessary operating funds.  The court has already rejected this argument and need not address it further, except to note again that Doctors Hospital had access to operating funds under the Nomura Loan in the form of excess cash drawn from the Cash Collateral Account.

---

[23]      Having affirmed the bankruptcy court's determination that the Daiwa borrowings belonged to MMA Funding at the time they were issued, this court declines to address Plaintiff's argument that Defendant was the "initial transferee" of Doctors Hospital's funds (i.e., the new Daiwa borrowings) during the post-July 1998 time period.

### III.   The Trial Court Did Not Clearly Err In Concluding that Doctors Hospital was Insolvent as of August 28, 1997

Turning now to Defendant's appeal, the court addresses, first, the issue of Doctors Hospital's insolvency.  The bankruptcy court adopted the analysis and conclusions of Plaintiff's experts in finding that Doctors Hospital was insolvent as of August 28, 1997.  Defendant argues on appeal that the bankruptcy court's determination of insolvency employed improper "hindsight bias" by considering facts that would not have been known to a hypothetical buyer as of the date of insolvency. [24]   In pressing its challenges to the finds concerning insolvency, Defendant attempts to cast certain of the court's conclusions as "legal errors underpinning factual determinations," which may be subject to a stricter standard than the "clear error" review applied to factual findings. (Def.'s Br. at 12, 30.)  Indeed, where the trial court "bases its finding upon mistaken impression of applicable legal principles," the appellate court is not bound by the clear error standard.  *Cox v. City of Chicago*, 868 F.2d 217, 220 (7th Cir. 1989) (quoting *Innwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 n.15 (1982)).   A review of the bankruptcy court's rulings, however, reveals no confusion about applicable legal principles or misunderstanding in the court's application of the law. The issues raised by Defendant in this appeal are almost all issues of fact, involving evidence of

---

[24]      As an initial matter, the court declines Plaintiff's invitation to sidestep Defendant's "hindsight bias" argument on grounds of waiver.  Plaintiff contends that Defendant failed to raise the issue of "hindsight bias" with respect to Plaintiff's expert's report, in Defendant's post-trial brief, in post-trial proposed findings of fact and conclusions of law, or in its motion to amend judgment. Defendant points out, however, that it could not have known what date of insolvency the bankruptcy court adopted until the court issued its Initial Findings of Fact and Conclusions of Law.  Only then could Defendant properly address whether the court had improperly applied "hindsight bias" in reaching its determination.  (Def.'s Reply at 19-20.)

Neither case Plaintiff cites presents circumstances like these: *In re Cohen*, 507 F.3d 610, 613-614 (7th Cir. 2007) concluded that a creditor waived an argument not presented in its summary judgment briefings to the bankruptcy court or in the appellate brief to the district court. *Klingman v. Levinson*, 114 F.3d 620, 628 (7th Cir. 1997), rejected a law-of-the-case argument as waived because it was not raised in a trial brief in *state* court before removal to federal court and because the state court's determination on the issue was mere dicta.  In this case, the date of insolvency was a major issue—indeed arguably *the* major issue—at trial.  *See* Initial Findings, 360 B.R. at 859. The court concludes it is not waived.

Doctors Hospital's insolvency at the time of its transfers to Defendant.  The court will reverse factual findings on this and related issues only where the bankruptcy court's determinations were clearly erroneous.  *See id.* at 220.

A.    The Bankruptcy Court Did Not Apply Improper "Hindsight Bias" in Determining that Doctors Hospital was Insolvent as of August 28, 1997

As noted, Defendant argues that the bankruptcy court improperly applied hindsight bias in concluding that, as of August 28, 1997, Doctors Hospital was insolvent, inadequately capitalized, and unable to pay its debts as they came due.  Defendant attacks Judge Schmetterer's analysis for its reliance on expert valuation testimony to the exclusion of contemporaneous market data and other facts that, Defendant contends, better reflected Doctors Hospital's financial condition.  The expert opinions adopted by the bankruptcy court, Defendant asserts, themselves indulged in improper hindsight bias resulting in a conclusion of insolvency as of August 28, 1997, when in fact, according to Defendant, Doctors Hospital was solvent on that date by more than $7 million.  (*See* Def.'s Br. at 29.)

The Bankruptcy Code and the Illinois Uniform Fraudulent Transfer Act ("IUFTA") both define "insolvent" as the condition in which the sum of an entity's debts is greater than all the entity's assets at a fair valuation.  *See* 11 U.S.C. § 101(32); 740 ILCS 160/3.  Generally, a fair valuation is the price a willing buyer would pay a willing seller, assuming reasonable knowledge of the facts on both sides.  Initial Findings, 360 B.R. at 853 (citing *In re Ebbler Furniture and Appliances, Inc.*, 804 F.2d 87, 92-93 (7th Cir.1986); *In re Hoffinger Industries, Inc.*, 313 B.R. 812, 817 (Bankr. E.D. Ark. 2004); *In re WRT Energy Corp.*, 282 B.R. 343, 369 (Bankr. W.D. La. 2001)).  If that value is positive, the entity was solvent on the date in question; if the value was negative, it was insolvent. See Initial Findings, 360 B.R. at 858.  Under the Bankruptcy Code and IUFTA, in order to recover a purported fraudulent transfer, a trustee must show by a preponderance of the evidence that the entity (i) was insolvent on the date that such transfer was made or such obligation was incurred,

or became insolvent as a result of such transfer or obligation; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured. 11 U.S.C. § 548(a) ; 740 ILCS 160/5(a)(2), 160/6. *See In re Eckert,* 388 B.R. 813, 831 (Bankr. N.D. Ill. 2008). The bankruptcy court here held that Plaintiff carried its burden under all three tests, but in order to uphold the lower court's conclusion that Doctors Hospital was insolvent as of August 28, 1997, this court need only find an absence of clear error as to any one test.

Insolvency is a question of fact subject to "clear error" review. *In re KZK Livestock, Inc.*, 290 B.R. 622, 625 (Bankr. C.D. Ill. 2002). Courts have applied a "rule of retrojection" to determine a debtor's insolvency at a given point in time. *In re Longview Aluminum, L.L.C.*, Nos. 03 B 12184, 04 A 01051, 04 A 00276, 04 A 00279, 2005 WL 3021173, at *5 (Bankr. N.D. Ill. July 14, 2005) *aff'd sub nom. In re McCook Metals, L.L.C.*, No. 05 C 2990, 2007 WL 4287507 (N.D. Ill. Dec. 4, 2007), *aff'd sub nom. Baldi v. Samuel Son & Co., Ltd.*, 548 F.3d 579 (7th Cir. 2008). Under that rule, if "a debtor was insolvent 'on the first known date and insolvent on the last relevant date,' and the trustee demonstrates 'the absence of any substantial or radical changes in the assets or liabilities of the bankruptcy between the retrojection dates,' the debtor is deemed to have been insolvent at all intermediate times." *Id.* (quoting *In re Toy King Distributors, Inc.*, 256 B.R. 1, 99 (Bankr. M.D. Fla. 2000) (citation omitted)).

On the issue of Doctors Hospital's insolvency, Judge Schmetterer used the "generally accepted" approach of basing his determination on "seasonable appraisals or expert testimony." *In re Roblin Indus., Inc.*, 78 F.3d 30, 38 (2d Cir.1996). His findings rely primarily, though not exclusively, on testimony and evidence presented by Plaintiff's experts Scott Peltz ("Peltz") and Michael Lane ("Lane") and by Defendant's expert Thomas Blake ("Blake"). For the most part, Judge Schmetterer sided with Peltz and Lane. As Judge Schmetterer was aware, a determination

of insolvency as of a particular date must not be influenced by events that occurred beyond that point in time. Initial Findings, 360 B.R. at 853 (citing *In re Taxman Clothing Co.*, 905 F.2d 166, 170 (7th Cir. 1990) (cautioning against the tendency of courts to consider a firm to be insolvent because hindsight makes obvious the debtor's path to financial ruin)). Thus, "information that the hypothetical willing buyer could not have known is obviously irrelevant," and "subsequent events are not considered in fixing fair market value," except to the extent that they were reasonably foreseeable at the date of valuation. *Id.* at 858 (quoting *First Nat'l Bank of Kenosha v. United States*, 763 F.2d 891, 893-94 (7th Cir. 1985)). The bankruptcy court was free, however, to "consider information originating subsequent to the transfer date if it tend[ed] to shed light on a fair and accurate assessment of the asset or liability as of the pertinent date." *In re W.R. Grace & Co.*, 281 B.R. 852, 869 (Bankr. D. Del. 2002) (quoting *In re Mama D'Angelo, Inc.*, 55 F.3d 552, 556 (10th Cir.1995) (citation omitted)).

Defendant objects to what it calls the court's "exclusive" reliance on expert testimony and cites "a growing body of law" favoring contemporary market evidence over post facto expert testimony prepared in anticipation of litigation. (Def.'s Br. at 58.) The three cases Defendant cites do express a preference for accurate contemporary market data where available, and this preference makes sense. *See In re Iridium*, 373 B.R. 283, 293 (Bankr. S.D.N.Y. 2007) ("[T]he public trading market constitutes an impartial gauge of investor confidence and remains the best and most unbiased measure of fair market value and, when available to the Court, is the preferred standard of valuation." (citing *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624 (3d Cir. 2007)); *Peltz v. Hatten*, 279 B.R. 710, 741-42 (D. Del. 2002) ("[S]tudies that are done after-the-fact and for the purpose of proving a point in an adversarial proceeding are too subjective and too subject to manipulation, and are not particularly probative of the way that industry participants, including the parties in this case, approached the valuation process in the period at issue.") Expert testimony is often prepared many years after the events at issue, and the temptation to indulge in hindsight

bias may be greater where the absence of an actual buyer requires a certain amount of speculation concerning what a "hypothetical buyer" would have known at the time.

The buyer in this case was indeed hypothetical. As Defendant emphasizes, Nomura's $50 million loan to HPCH did not put it in the shoes of an actual buyer of Doctors Hospital, regardless of how extensively Nomura reviewed Doctors Hospital's financial health. (Def.'s Reply at 40 n.41.) Nevertheless, a preference for contemporaneous market evidence is by no means a requirement, and even where available, contemporaneous data does not preclude a court from assigning greater weight to expert testimony, particularly where, for example, the methodology employed at the time was itself faulty or biased. The trial court is always free to consider contemporaneous data in light of the methodology employed and in light of other evidence in the record. Judge Schmetterer did so throughout the Initial and Additional Findings of Fact and Conclusions of Law, as reviewed in detail below. This court's task is not to reweigh the evidence, but to ask whether the bankruptcy court clearly erred in concluding, in light of all the evidence presented, that Doctors Hospital was insolvent as of August 28, 1997.

### B.    The Bankruptcy Court Did Not Err in Adopting Plaintiff's Experts' Opinions

Defendant argues that the conclusions of Plaintiff's experts concerning Doctors Hospital's insolvency, insofar as they were adopted by the bankruptcy court, incorporated events that could not have been known to a hypothetical buyer of Doctors Hospital on August 28, 1997. (Def.'s Br. at 45-54.) The Lane/Peltz Report used the "balance sheet test" for insolvency set out in Section 101(32)(A) of the Bankruptcy Code and valued Doctors Hospital as a going concern. 11 U.S.C. §101(32); Initial Findings, 360 B.R. at 854. Applying three different valuation methods—the capitalized cash flow method, the capital market method, and the merger and acquisition method—Peltz and Lane concluded that all three yielded a negative fair value of equity of Doctors Hospital assets and, thus, insolvency as of August 28, 1997. *Id.* Plaintiff's experts and the trial court treated the capitalization of cash flow method as the primary method of analysis and regarded

the other methods as merely corroborative of those results.  *See id.* at 864-65.  The trial court

summarized the results as follows:

**Indicated Fair Value of Equity (in Thousands)**

| Valuation Method | September 30, 1997 ($) | September 30, 1998 ($) | September 30, 1999 ($) | March 31, 2000 ($) |
|---|---|---|---|---|
| Capitalization of Cash Flow Method | (18,882)[25] | (19,227)[26] | (28,556) | (31,946) |
| Capital Markets Method | (20,286) | (13,331) | (36,104) | (32,415) |
| Merger and Acquisition Method | (23,449) | (19,940) | (49,962) | (43,036) |

*Id.* at 854.  In addition, the court noted that Plaintiff's experts performed a sensitivity analysis[27] to

test the key assumptions for Doctors Hospital's asset values and liabilities.  *Id.* at 855.

In siding with Plaintiff on the date of insolvency, the bankruptcy court noted that Lane was

"an expert in health care, Medicare/Medicaid, and the Chicago health care market" and was able

to testify "in great detail concerning the numerous regulatory and market factors that ultimately led

to Doctors Hospital's demise."  Defendant's insolvency expert, by contrast, had "no such special

---

[25]    The Peltz/Lane report actually gives a negative value of $15,822 million for September 30, 1997, under the capitalization cash flow method.  The court presumes that the bankruptcy court incorrectly transposed this figure.  (Ex. C2 at 4 to Jt. Ex. 72.)

[26]    The Peltz/Lane report actually gives a negative value of $10,227 million for September 30, 1998, under the capitalization cash flow method.  The court presumes that the bankruptcy court incorrectly transposed this figure.  (Ex. C2 at 4 to Jt. Ex. 72.)

[27]    A "sensitivity analysis" tests how variations in input affect a given model's output. For example, Lane and Peltz checked their three valuation methods against another method that used Doctors Hospital's "adjusted book value" rather than Doctors Hospital's value as a going concern.  They concluded that under that test, Doctors Hospital would still have been insolvent as of August 28, 1997.  (Jt. Ex. 72, Tab C5.)  They performed a similar analysis regarding the extent of Doctors Hospital's liabilities with respect to the federal investigations and reached the same results as to the date of insolvency.  (*Id.*)

expertise" and no background in the healthcare industry.  *Id.*  In light of this disparity, the bankruptcy court found Plaintiff's evidence on insolvency to be "generally more credible" than Defendant's.  *Id.*

Defendant complains of the following incidents of "hindsight bias" in the evidence offered by Plaintiff's experts:

- Plaintiff's experts reduced Doctors Hospital's net income as of September 30, 1997 after adjusting for certain settlements related to investigations of Medicare and Medicaid fraud that were not entered into until May 1999 and December 2000.

- Plaintiff's experts used an inflated specific company risk premium in calculating the capitalization of Doctors Hospital by improperly factoring in the risk of fraud occurring at the hospital and the projected effect of the Balanced Budget Act of 1997.

- Plaintiff's experts refused to add back $4.5 million that Defendant claims Doctors Hospital wrote off in 1997.

- Plaintiff's experts improperly concluded that a hypothetical buyer would have deducted the amount representing above-market rent payable over the term of the HPCH Lease, resulting in a reduced enterprise value tax deduction.

As explained here, the court concludes these factors do not call Plaintiff's conclusions into question.

### C.    Medicare/Medicaid Fraud

At the inception of the Nomura Loan in August 1997, Doctors Hospital was the subject of a federal investigation into billing irregularities known as "upcoding."  Initial Findings, 360 B.R. at 836 ¶ 394.  "Upcoding" occurs when a healthcare provider receives reimbursements from Medicare and Medicaid based on a more acute (and therefore more costly) diagnosis than the patient's condition warranted.  *Id.*  In 1999, Doctors Hospital settled with state and federal authorities, agreeing to pay a fine of $4.5 million for upcoding overcharges that occurred from 1993 through 1998.  *Id.* ¶ 396.  A separate federal investigation focused on (1) kickbacks paid to Doctors Hospital's physicians in exchange for medically unnecessary patient admissions; and (2) the

hospital's inability to establish medical necessity and Medicare eligibility requirements for certain physicians' services. *Id.* ¶ 397. In December 2000, Doctors Hospital entered into a $14.5 million settlement regarding the kickback and other fraud allegations, again for events occurring from 1993 through 1998. *Id.* ¶ 398. Doctors Hospital thus owed a total of $18.5 million in fines for Medicare and Medicaid-related violations. Defendant Desnick ultimately paid both fines.

Plaintiff's experts' balance sheet test referred to these two settlements in estimating "reductions in earnings attributable to alleged overstatements of revenues as of September 30, 1997," and reduced Doctors Hospital's net income as of that date by some $3 million. (Ex. C2 at 5 to Jt. Ex. 72.) The Peltz/Lane Report used settlement documents prepared by the government for Doctors Hospital that outlined estimated fraudulent earnings by year, and multiplied that number by a percentage representing the total amount of the settlement divided by the total amount of alleged fraudulent activity. (*See* Settlement Agreements, Jt. Exs. 161, 162.) Thus, Plaintiff's experts deducted from Doctors Hospital's net income $2,665,000 in fraudulent earnings from kickback activity for fiscal year 1997. They arrived at this number by multiplying the estimated kickback activity in 1997 by 69.6%, the percentage that the kickback-related settlement ($14.1 million) represented of the total alleged kickback-related fraud ($20.1 million). The Lane/Peltz Report applied the same method in deducting $374,000 in estimated fraudulent earnings related to upcoding for fiscal year 1997. As the expert report explained, "[t]he prospective net income that could be expected to be received by a hypothetical third-party buyer would not include the earnings from these activities." (Ex. C2 at 5 n.5 to Jt. Ex. 72.)

Defendant protests that on August 28, 1997, a hypothetical third-party buyer could not have taken account of liabilities that were not determined and settled until 1999 and 2000, and therefore these reductions violated the rule against the use of hindsight in determining fair value. (Def.'s Br. at 47.) The deducted amounts were not insignificant. Keeping all other calculations constant, adding back the deductions related to the Medicare and Medicaid fraud settlements yields a

positive "Indicated Fair Value of Equity" of $5,724,623, as compared to the negative $15,882,000 in the Lane/Peltz Report. (*See* Def.'s Br. at 46-49.)

Defendant has not adequately explained its theory that so long as the amount of the fraud was undetected it may be ignored for valuation purposes. Tellingly, Defendant's own insolvency expert, Blake used the same methods as Plaintiff's experts and made similar income adjustments based on alleged fraudulent earnings for fiscal year 1997. (Jt. Ex. 31, at 15; Pl.'s Resp. 44-45). Blake's report reflects deductions of $2,665,000 in "Alleged Fraudulent Earnings – Kickbacks" and $750,000 in "Alleged Fraudulent Earnings – Upcoding." (Jt. Ex. 31 at 15.) Moreover, those deductions were based on the very same $4.5 million and $14.1 million settlements used in Plaintiff's expert's report. (Jt. Ex. 31, Ex. 2.0 at 1-2.) Unlike Plaintiff's report, these deductions do not yield a calculation of insolvency, and Blake's report does not adequately explain how it arrived at these figures. But the rationale behind the reductions is unmistakable: both sets of experts believed some reduction was warranted based on known future liability for the Medicare/Medicaid violations. Blake's own report states:

> The existence of government "regulatory investigations" was disclosed in 1997 and 1998 financial statements, with a $4.5 million settlement recorded in 1997 as a liability and a reduction to revenue. The $14 million settlement was not recorded in 1997 or 1998. Virtually all of the hospitals in the industry were reporting regulatory investigations and settlements. Therefore, we have recorded the entire amount of the ultimate government regulatory settlements as a reduction of enterprise value.

*Id.* at 16. In short, both sets of experts believed future liability was foreseeable as of August 30, 1997, with only the amount of the reductions differing. The trial court simply found Plaintiff's experts more credible in light of their experience and expertise in valuing similar entities, and appropriately adopted their conclusions with respect to the date of insolvency.

Defendant urges that contemporary data admitted at trial better reflects what a hypothetical buyer would have known at the time of the Nomura Loan. In support, Defendant cites a financial review of Doctors Hospital by the firm Coopers & Lybrand dated July 30, 1997. Nomura

commissioned the review prior to the Nomura Loan to "(i) verify current and projected net income to support the $50 million loan; (ii) determine if any significant regulatory, market or competitive factors would impact on on-going operations and the financial performance of the Debtor; and (iii) whether any significant internal factors would preclude Nomura from entering into the $50 million loan." Initial Findings, 360 B.R. 823 ¶ 279. Coopers & Lybrand estimated a $4.6 million "best case" reduction in revenues due to fraudulent transfers from upcoding. *Id.* at 862-63. That estimate covered a twelve-month period ending in July 1997; included only violations related to Medicare, not Medicaid; and reflected the use of generally accepted accounting standards. *Id.* By contrast, Coopers & Lybrand's "worst case" reduction, again covering the same period, violations and billing codes, was $29 million. *Id.* (Tr. III: 120-22.) As the trial court noted, a hypothetical buyer would have to consider this higher reduction over the more conservative estimate. *Id.* Far from ignoring this kind of contemporary data, both the trial court and Plaintiff's experts used it to support their conclusion that, at the very least, a hypothetical buyer would have been aware of the alleged Medicare-related upcoding and a potential resulting liability ranging anywhere from $4.6 million to $29 million.

In arguing that reductions for Medicare/Medicaid fraud in 1997 were improper, Defendant relies heavily on *In re Edgewater Medical Center*, 373 B.R. 845 (Bankr. N.D. Ill. 2007). In an insolvency determination in that case, the bankruptcy court refused to consider similar evidence of Medicare fraud occurring at the time of certain rent transfers to plaintiff's landlord. *Id.* at 854. But, as the plaintiff's own experts testified at trial, in that case, the Medicare fraud was unknown, and while its discovery certainly could have resulted in insolvency, the facility was nonetheless solvent at the time of the transfers. *Id. In re Edgewater* is thus distinguishable from the instant case, where the trial court heard both expert and contemporary evidence on what was known as of August 28, 1997. In 1995 and 1996, a grand jury served Doctors Hospital with document subpoenas, which Doctors Hospital believed to be related to "upcoding violations," and Doctors

Hospital disclosed this fact to Nomura in 1997. (Nomura Loan Agreement, Jt. Ex. 11, Ex. D.) The Coopers & Lybrand report, commissioned by Nomura in 1997, estimated potential future liability related to Medicare upcoding between $4.6 million and $29 million. Finally, both sides' experts adjusted Doctors Hospital's net income in 1997 based on fraudulent transfers attributable to upcoding violations and "kickbacks." Unlike *In re Edgewater*, the evidence in this case shows that a hypothetical buyer in 1997 would have been aware of the ongoing Medicare fraud at Doctors Hospital. Also in contrast to *In re Edgewater*, there is evidence that Doctors Hospital would have been insolvent as of August 28, 1997 regardless of whether the total extent of the fraud had come to light as of that date. The trial court thus did not err in adopting Lane/Peltz's reductions based on Medicare and Medicaid fraud.

### D.    Inflated Specific Company Risk Premium

Next, Defendant argues that Plaintiff's experts applied an improper 10% "specific company risk premium" based on the Medicare and Medicaid fraud at Doctors Hospital and the impact of the Balanced Budget Act of 1997. (Def.'s Br. at 49.) As the term suggests, a specific company risk premium factors in the non-systematic risks of a particular business. *See, e.g.*, *In re CNB Intern., Inc.*, 393 B.R. 306, 320 (Bankr. W.D.N.Y. 2008) (defining "specific company risk premium" as "an unsystematic risk factor [that] adjusts for risks associated with a particular business, and with its finances, industry position, and operations.") This figure is in turn used in calculating the after-tax-weighted average cost of capital ("WACC"), a risk-adjusted discount rate that is itself used in calculating the capitalization rate applied to Doctors Hospital's cash flow. *See In re Am. HomePatient, Inc.*, 298 B.R. 152, 176 n.20 (Bankr. M.D. Tenn. 2003) (The WACC "is an average of the costs of all sources of capital (debt, preferred and common equity, etc.) for the subject company, with each source weighted by its respective percentage share in the capital structure.") (internal citations omitted)). In application, an increase in the specific company risk premium decreases the capitalization rate, thereby reducing the value attributed to the entity being valued.

Peltz testified that in calculating the specific risk premium he looked at "specific issues relating to the hospital," including depth of management, fraud occurring at the hospital, management's reputation, unreliability of financial statements, and the greater effect that the Balanced Budget Act of 1997 ("BBA") would have on Doctors Hospital because of its high percentage of Medicare/Medicaid patients. *Id.* (Tr. IV: 91-93.) Blake, by contrast, employed a 5% specific company risk premium based on nothing more than "the nature of the related party transactions with Desnick and his associated entities." (Tr. VI: 73-75.) He justified excluding all other risks on the ground that "adjustments have been made to normalize historical financial performance, industry factors are already 'baked into' the beta factor affecting the equity risk premium, and a size adjustment has already been incorporated." (Jt. Ex. 31 at 25; Tr. VI: 73-75.)

Lane disagreed with Blake's assumption about "baked-in" industry risk. Lane testified that the federal regulatory investigations focused on "selected targets" and that the risk of investigation was therefore specific to Doctors Hospital. Further, as the trial court noted, risks associated with the hospital's management, reputation, finances, and ongoing fraud, as well as the prospective impact of the BBA, were not otherwise accounted for in the calculation of the WACC, which was the reason that Plaintiff's experts considered these in calculating the specific company risk premium. Initial Findings, 360 B.R. at 861-62. Finally, the court observed that Arthur Gimmy, one of Defendant's experts in its related litigation against Nomura, concluded that Doctors Hospital, an "atypical subject, with its over-reliance on Medicare and Medicaid, would need to be capitalized at the highest end of any survey of acute hospitals." Initial Findings, 360 B.R. at 862. (Jt. Ex. 53 at 47.)

Defendant counters that the BBA's impact on Medicare and Medicaid could not have been known as of the date of insolvency. Almost all the BBA's provisions had an initial effective date of July 1, 1998, so Doctors Hospital would not have felt its impact until after that date. Initial Findings, 360 B.R. at 836 ¶¶ 391-92. But, as the trial evidence showed, the prospective effects of the BBA

could be estimated prior to its effective date, and a hypothetical buyer would not have ignored the associated risk. As the trial court noted, the BBA and its impact were highly anticipated in the healthcare industry in 1997. For example, the CEO of Doctors Hospital wrote to U.S. senators and congressmen to express his concern about the effects of the act. *Id.* ¶ 388. (Jt. Ex. 36.) Defendant's expert Gimmy believes that the BBA was "the biggest financial news event in years during the first half of 1997" and "had the potential to bankrupt hospitals like [Doctors Hospital]." (Jt. Ex. 53 at 24.) Taking this into account, Lane concluded that the BBA would cost Doctors Hospital $1.6 million beginning in 1998. Further, as the court noted, "Allen Dobson, one of Nomura's experts in its litigation with the Trust, calculated in a retrospective analysis that in 1997 Doctors Hospital stood to lose $1.3 million in Medicare payments in 1998 and $3.7 million in 1999 as a result of the BBA." (Def. Ex. 2 at 3.) Given this evidence and the numerous other company-specific risks unrelated to the impact of the BBA, the bankruptcy court reasonably concluded that Plaintiff's experts were, if anything, conservative in choosing a 10 percent risk premium. Initial Findings, 360 B.R. at 862.

### E. The $4.5 Million Add-back

Defendant contends that the bankruptcy court erred in refusing to add back to Doctor's Hospital's net income $4.5 million in fraudulent earnings that were allegedly booked in 1997. (Def.'s Br. at 51-52.) This argument is non-starter. As the bankruptcy court noted, the evidence that Doctors Hospital wrote off the $4.5 million in 1997 at all was sparse at best. Defendant's expert based his conclusion not on financial statements, but on three documents not in the record (identified only as "Adjusted Entries," "Doctors Hospital of Hyde Park, Inc. (FYE 9/30)," and "Working Capital Ratio as of 9/30/97 Balance Sheet for Use in Projected Cash Flows") and a memorandum from September 1998. Initial Findings, 360 B.R. at 862. (*See* Expert Report of Thomas M. Blake, Jt. Ex. 31 at 24 n.44.) The memorandum in the record is merely a two-page summary of "Major Financial Statement Issues" from Doctors Hospital's CFO, Richard Felbinger,

to Dr. Desnick, dated September 1, 1998. (Jt. Ex. 66.) Doctors Hospital's actual financial statements (albeit generally unreliable) do not reference the $4.5 million until 1999. *Id.*

In any event, this court agrees with Judge Schmetterer that even if Doctors Hospital booked the $4.5 million in fiscal year 1997, adding it back to the net income made no sense given the systemic nature of the fraud and Doctor's Hospital's shrinking revenue. Revenues generated through prolonged, systemic fraud cannot typically be accounted for in a one-time adjustment, as billing irregularities are rarely limited to a regular, twelve-month fiscal cycle. *Id.* The trial court cites Lane's testimony that Doctors Hospital "was riddled with fraud which really affected the revenues that were reported and suggested that the revenues that were reported were not accurate." (Tr. IV: 126-27.) Further, the Coopers & Lybrand report, as one of Defendant's own experts in the Nomura litigation noted, "called into question the validity of the Hospital's previously reported historical financial performance as well as the hospital's future ability to achieve this level of financial performance." (Jt. Ex. 146 at 9.) As discussed in detail above, the Coopers & Lybrand report estimated a minimum $4.6 million reduction in patient revenues based strictly on Medicare upcoding violations for the period of July 31, 1996 through July 31, 1997, and Coopers & Lybrand's work papers related a maximum of $29 million. This projected range of liability alone would make a $4.5 million add-back to net income absurd from the perspective of a hypothetical buyer. *See* Initial Findings, 360 B.R. at 862-63. In addition, there was evidence that Doctors Hospital "consistently collect[ed] less cash than it was receiving as revenues." (Robinson Memorandum, Jt. Ex. 76.) Finally, the prospective effect of the Balanced Budget Act also counseled against an add-back. As noted above, the trial court's consideration of the anticipated effect of the Balanced Budget Act on an entity heavily dependent on Medicare and Medicaid reimbursements does not constitute impermissible hindsight. In sum, it was certainly not clear error to adopt Plaintiff's experts' approach in refusing to make a $4.5 million add-back, particularly in light of then-known fraudulent activity, shrinking revenues, and projected losses.

### F.     Reduction of Above-Market Rent

In their insolvency analysis, Plaintiff's experts "normalized" Doctors Hospital's net income by reducing its above-market rent payments under the HPCH Lease to fair market value.  (*See* Lane/Peltz Report, Jt. Ex. 72, Tab C.2; Tr. IV: 86-87.)  This adjustment resulted in a $31,530,000 deduction from Doctors Hospital's August 28, 1997 enterprise value, by far the largest deduction under the Plaintiff's method.  Defendant argues that this deduction should be reduced by $10.7 million—the amount of tax savings a hypothetical purchaser would achieve by deducting the Lease payments from taxable income.  (Def.'s Br. at 53.)  The trial court rejected this argument, holding that no tax savings rate should apply because "the excess lease payments represented amounts above fair market value" that would not be deductible under the Internal Revenue Code.  Initial Findings, 360 B.R. at 864.  As the court noted, "a purchaser of Doctors Hospital would not pay in excess of fair market rent because [under Section 482 of the Internal Revenue Code] he would not be allowed to deduct any business expense that exceeds fair market."  *Id.* at 863.  Defendant contends this rationale indulges in improper speculation about actions the IRS might have taken in the future regarding Doctors Hospital's inflated lease payments.  (Def.'s Br. at 53-54.)  A more attentive reading of the bankruptcy court's opinion, however, reveals that the court was concerned not with what the IRS might do, but how a potential buyer would devalue Doctors Hospital based on its inability at the time to make deductions from income based on excess rent payments.  The court did not need to ponder the future actions of the IRS to conclude that a hypothetical buyer would consider the proper application of the Internal Revenue Code to Doctors Hospital's income, and proper application of Section 42 of the Code would not permit deductions based on above market rent.  *See* 26 U.S.C. § 482.  The $31,530,000 deduction from Doctors Hospital's net income as of August 28, 1997 was not clear error.

In a related argument, Defendant criticizes the characterization of the above-market lease payments as "debt" for the purposes of an insolvency determination and "rent" in contexts where

Plaintiff wished to avoid its waiver of any "debt" repayment. The bankruptcy court was aware of this alleged "inconsistency" and was comfortable treating the lease payments as debt in the limited context of determining the appropriate discount rate in normalizing the excess lease payments. Lane and Peltz used the Nomura Loan rate as the discount rate. Defendant apparently disputes this calculation only insofar as it treats Doctors Hospital lease payments as payments of debt. (Def.'s Br. at 53; Def.'s Reply at 46 n.45.) Judge Schmetterer explicitly found that "[t]o the extent that the rent payments exceeded fair market value, *Lane/Peltz viewed them as debt* and deducted them from the enterprise value." Initial Findings, 360 B.R. at 863 (emphasis added). He additionally noted:

> Because the lease payments were designed to service the Nomura Loan debt, it was appropriate to use the interest rate on that loan. Peltz also felt it would be inappropriate to use WACC [as Blake did] because it contains a large element of equity return, while the lease relates to a debt.

Initial Findings, 360 B.R. at 864. Peltz backed up this approach with an authoritative text on valuation that emphasized the importance of matching the discount rate with the economic income being discounted. *Id.* (*See* Tr: IV at 123-26.) Further, this approach is consistent with the bankruptcy court's treatment of the lease payments as "rent" with respect Defendant's role as assignee of the HPCH Lease and "debt" with respect to its role as successor to Nomura:

## IV. The Bankruptcy Court Did Not Clearly Err in Treating Doctors Hospital as a Subchapter C Corporation for Valuation Purposes

Lane and Peltz imposed a tax rate of 40% on Doctors Hospital's reported income, resulting in a reduction of $2.2 million in 1997. Initial Findings, 360 B.R. at 856. Although the parties stipulated that Doctors Hospital was a Subchapter S corporation, exempt from federal taxation, Peltz's analysis treated Doctors Hospital as similar to a C corporation subject to federal income tax on the basis that this approach is standard when valuing a controlling interest in an S corporation. (Jt. Ex. 202, ¶ 1.) Defendant challenges the bankruptcy court's decision to adopt Plaintiff's approach.

How to address the effect of taxation in valuing a Subchapter S corporation is a contentious issue among experts in the field of valuation. If, for example, another Subchapter S corporation purchased Doctors Hospital, the buyer would continue to enjoy tax-exempt status; conversely, if a Subchapter C corporation purchased Doctors Hospital, it would be subject to federal taxation. The perspective of a hypothetical S corporation buyer would therefore differ significantly from that of a C corporation buyer. Peltz justified his decision on the ground that "it is standard methodology to tax-affect the normalized cash flow of an S corporation" when valuing a controlling interest. For him, the dispositive issue was not the status of the corporation or the potential pool of buyers, but whether he was valuing a controlling interest. (Tr. IV: 178-79.) In this case, Peltz was valuing the 100 percent controlling interest of Dr. Desnick. The authority for this approach came from a book by two experts in business valuation, excerpts of which were admitted into evidence. (Tr. IV: 139-140.)

Blake, Defendant's expert, apparently without reference to external authority, did not adjust Doctors Hospital's reported income for taxation. He observed that Doctors Hospital was an S corporation with no history of paying federal income taxes and that "there was no information indicating they [Doctors Hospital] were going to be purchased by a C corporation." Defendant cites Blake's testimony and certain admissions by Peltz and Lane that the current "valuation community" has reached a general consensus that the decision to adjust the values of an S corporation is highly fact-dependent, with the likely pool of buyers frequently regarded as the determining factor. The court found that Peltz assumed a "for profit" (Subchapter C) company was the most likely hypothetical buyer. His co-author Lane testified that "there was really no target acquirer for Doctors Hospital." (Tr. III: 129-31.) Lane further admitted that for-profit companies had largely exited the hospital markets in Chicago and that in the Chicago, Illinois, area from 1994 to 2000, ten not-for-profit companies purchased hospitals, while only one for-profit company made a hospital acquisition. Initial Findings, 360 B.R. at 831, ¶¶ 344, 346. (Tr. VIII: 30-31.)

The trial court nevertheless concluded that Peltz relied on more persuasive authority than Blake did. The court thus agreed that the valuation of a 100 percent interest justified calculating Doctors Hospital's value as a C corporation. The court concluded its analysis on this issue with the following:

> Moreover, it is not logical to suggest that a buyer would pay substantially more for Doctors Hospital just because the buyer is an S corporation. The object of an insolvency analysis is to determine the value of Doctors Hospital to a theoretical buyer, regardless of the nature of the buyer.

Initial Findings, 360 B.R. at 857 (citations to the record omitted). This may be an overstatement; the nature of the buyer, theoretical or not, would appear to be significant to determining Doctor's Hospital value from that buyer's perspective. An S corporation would not necessarily pay substantially more for Doctors Hospital, but a C corporation would almost certainly take into account a 40% increase in tax liability when contemplating the purchase of an S corporation. It is not, however, for this court to reweigh evidence. The decision of the bankruptcy court did not rest on the logic of what a hypothetical S corporation would pay, but on Peltz's expert testimony, backed by external expert authority, that the dispositive factor in deciding how to value an S corporation was ownership interest. It did not clearly err in concluding that valuing Doctors Hospital as a C corporation was appropriate in light of Desnick's 100 percent controlling interest.

## V.     Conclusion as to the Bankruptcy Court's Finding of Insolvency

The court holds that the bankruptcy court did not apply improper hindsight bias in determining that Doctors Hospital was insolvent as of August 28, 1997 under the balance sheet test for insolvency; nor did the bankruptcy court clearly err in valuing Doctors Hospital as a Subchapter C corporation to reach that conclusion. The court therefore affirms the bankruptcy court's finding that as of August 28, 1997 Doctors Hospital was insolvent within the meaning of Section 548(a)(i) of the Bankruptcy Code and Section 160/6(a) of IUFTA. 11 U.S.C. § 548(a)(i) ; 740 ILCS 160/6.

## VI.    The Bankruptcy Court Properly Concluded That the Pre-July 1998 Transfers Were Payments of Rent, not Debt

Defendant disputes the bankruptcy court's finding that the pre-July 7, 1998 transfers were rent rather than debt. The distinction is crucial to Defendant's appeal, as Plaintiff waived all claims to recover "debt" payments and thus could not recover against Defendant if the transfers constitute debt. Defendant advances three arguments for why the trial court erred in treating the transfers as rent: (1) Doctors Hospital did not make the payments in accordance with the HPCH Lease provisions; (2) as a lender, Defendant could only receive repayment of "debt"; and (3) as a REMIC Trust, Defendant could hold only debt instruments and permitted investments, and therefore the transfers could not have been rent. (Def.'s Br. at 68-71.)

### A. HPCH Lease Provisions

Defendant's first argument posits that the HPCH Lease provides for only two methods of rent payment: (1) "to Landlord at 5800 South Stoney (sic) Island Avenue, Chicago, Illinois, 60637-2099 or such other location as designated by the Landlord," or (2) "by way of transfer of funds by Daiwa to the Cash Collateral Account." (Jt. Ex. 18, at 1, § 2.1.) Defendant reads the second method as restricting valid transfers to a single transferor: Daiwa. Defendant contends that the Nomura Loan Agreement and the Cash Flow Agreements reflect this intent in that transfers would flow directly from Daiwa to the Cash Collateral Account, bypassing Doctors Hospital. This restrictive reading of the HPCH Lease, however, ignores entirely the language in the first provision, which nowhere limits who may pay rent or how payments are to be made, save that the location must be either HPCH's address or an alternative designated by HPCH. Whatever the terms of the Nomura documents, a plain reading of this first clause clearly allows for the designation of another location for payment under the Lease. It is thus possible to read the HPCH's Assignment of the Lease as designating the Cash Collateral Account (Defendant's bank account) as the "location" designated by the landlord where Doctors Hospital should send rent payments.

The bankruptcy court's reasoning on this point is brief:

Defendant also argues that Doctors Hospital's direct transfers to the Trust must have been debt payments because the Lease only permitted payment of rent in one of two ways: (1) by payment to HPCH at Doctors Hospital's place of business or other such place as designated by HPCH; or (2) by way of transfer of funds by Daiwa to the Cash Collateral Account.

However, HPCH did designate another entity to receive rent when in the Assignment it assigned its right to receive rent to the Trust. (Jt. Ex. 89.) It was thereby made clear to all parties to the Nomura Loan transaction that Doctors Hospital would pay rent to the Trust. Pursuant to direction of HPCH in the Assignment, Doctors Hospital complied with the Lease by paying rent to the Trust.

Additional Findings, 373 B.R. at 68. The bankruptcy court's use of "entity" rather than "location" in the second quoted paragraph suggests that the Trust, as assignee, acquired the right to designate the location of payment and, in accordance with the Nomura Loan transaction, designated its own Cash Collateral Account. Plaintiff urges that "viewing the transaction as a whole" it is also possible to conclude that "HPCH [as opposed to the Trust] had designated Defendant's bank account as the 'location' where Doctors Hospital should send rent payments." (Pl.'s Resp. at 67.) In any event, this court concludes that HPCH as landlord was free under the terms of the Lease to designate Defendant's account as the location for rent payments, and nothing in the Lease Assignment affected this right. That the designated location was the Cash Collateral Account, the same location specified in the second method for rent payment, does not limit HPCH's authority to direct transfers under the first method.

## B.    Defendant Could Receive Payments of Rent

Defendant protests that, as a lender, it could not receive payments of rent under Illinois law. According to Defendant, the HPCH Lease Assignment was merely an assignment of rent, with HPCH remaining the owner and lessor of the Hospital property. In Illinois (the location of the Hospital property), Defendant notes, an assignment of rent as collateral for a mortgage conveys only a lien on rents. *See In re Randall Plaza Ctr. Assocs., L.P.*, 326 B.R. 133, 139-40 (Bankr. N.D. Ill. 2005) ("In Illinois, an assignment of rent creates a valid lien on rental income.") (citations omitted)). (Pl.'s Br. at 69.) In fact, Illinois courts may treat an assignment of rent as a lien interest

84

even where the assignment's language purports to make the assignment "absolute." *See In re Foundry of Barrington P'ship*, 129 B.R. 550, 556-57 (Bankr. N.D. Ill. 1991) (holding that "absolute" assignment of rent was merely a lien interest where debtor still held property rights in rent until there was a default under mortgage and where the assignment terminated upon full payment of the debt).  As Defendant notes, Section 101(37) of the Bankruptcy Code defines a lien as "a charge against or interest in property to secure payment of the debt and performance of the other obligations of the borrower."  11 U.S.C. § 101(37).  Put simply, Defendant claims its interest was limited to that of a lien-holder and "exist[ed] only to assure payment of debt or performance of other obligations of the debtor." *In re Foundry*, 129 B.R. at 556-57.  Because Defendant held only a right to debt repayment, Defendant asserts, the transfers could not have been payments of rent.

Judge Schmetterer dismissed Defendant's "lien theory" as irrelevant on the ground that Plaintiff is not seeking to enforce a rent assignment:

> The rule of law cited by Defendant might have been applicable if the Plaintiff were seeking to enforce a rent assignment. . . . In this case, however, no party is seeking to enforce the Assignment.  Defendant clearly had a right to receive rent payments, and it accepted property of the estate as rent payments regardless of whether or not it perfected its lien interest by following Illinois law.

Additional Findings, 373 B.R. at 66-67.  The language of the Assignment also granted Defendant (via Nomura) expansive rights over its application of the rent to the Nomura Loan:

> Assignor does hereby absolutely and unconditionally assign to Assignee all of Assignor's right, title, and interest in all current and future Leases and Rents, it being intended by Assignor that his assignment constitutes a present, absolute assignment and not an assignment for additional security only.  This Section 2 presently gives Assignee the right to collect Rents and to apply the Rents in partial payment of the Note and Loan Obligations and otherwise in accordance with the terms of the Loan Agreement.

(Jt. Ex. 89, ¶ 2.)  More important, Defendant, as assignee, had the right to receive payments of rent from Doctors Hospital, and Doctors Hospital had a reciprocal obligation to make rent payments under the Lease.  Additional Findings, 373 B.R. at 68.  Doctors Hospital had no obligation, however, to make debt payments on the Nomura Loan unless its Guaranty was called, and this did not

happen during the time period in question. *Id.* Thus, as the bankruptcy court concluded, the Trust necessarily received transfers of rent from Doctors Hospital, which it had the right to apply to the Nomura Loan debt as Nomura's successor-in-interest.

Defendant also argues, in tension with its position on the "initial transferee" issue, that regardless of whether the transfers constituted rent from Doctors Hospital's perspective, Defendant nonetheless received them as debt repayment on the Nomura Loan. As an Illinois landlord, Defendant contends, HPCH still owned and received rent from Doctors Hospital, even if it designated Defendant's bank account as the location of the rent transfers. Defendant offers the example of a bank who makes a mortgage loan to a borrower and obtains a mortgage and assignment of lease as collateral. Under such an arrangement, lease payments are made directly to the bank; payments to the bank, however, do not constitute rent, but a payment on the underlying promissory note and mortgage. (Def.'s Br. at 69.) Plaintiff avers that this illustration is "meaningless" because fraudulent transfer analysis focuses on the debtor's point of view. (Pl.'s Resp. at 6.) Plaintiff cites three cases in which the courts focus on the debtor's perspective in determining whether it received reasonably equivalent value for an allegedly fraudulent transfer. *See In re Hanover Corp.*, 310 F.3d 796, 802 (5th Cir. 2002); *In re L&D Interests, Inc.*, 350 B.R. 391, 401 (Bankr. S.D. Tex. 2006); *In re Dunbar*, 313 B.R. 430, 437 (Bankr. C.D. Ill. 2004). Plaintiff also cites the bankruptcy court's finding that "for the purposes of this fraudulent action, what is relevant is that Doctors Hospital made rent payments from money that it controlled and which the Defendant accepted and then applied in partial payment of the Nomura Loan." Additional Findings, 373 B.R. at 21. In other words, Defendant's possible interest as a lien holder has little to do with the real issue in a fraudulent transfer action: whether Doctors Hospital received reasonably equivalent value for its payments of rent under the HPCH Lease and Lease Assignment. The transfers were intended as rent, and as rent, they exceeded fair market value; the recipient and "initial transferee" of these payments was not HPCH, but Defendant, and it is from Defendant that Plaintiff is entitled

to recover.

### C.     Defendant's Status as REMIC Trust

Defendant asserts that because it is a REMIC Trust, and, under the IRC, a REMIC cannot receive rent, Doctors Hospital's payments could not have been rent.  Defendant has failed to present any evidence that it complied with the requirements for a REMIC under the IRC.  *See* Additional Findings, 373 B.R. at 70.  Regardless, Defendant's status as a REMIC would not alter the fact that it accepted rent payments from Doctors Hospital and applied them to the Nomura Loan.

### VII.    The Court's Award of Prejudgment Interest

Judge Schmetterer awarded Plaintiff $1,672,492.08 in prejudgment interest.  (Adversary Case Dkt. No. 599.)  Whether to grant prejudgment interest is within the bankruptcy court's discretion.  *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.,* 874 F.2d 431, 439 (7th Cir. 1989). When no interest rate is set by statute, prejudgment interest should be awarded at the market rate, that is, the average of the prime rate for the years in question.  *Cement Div., National Gypsum Co. v. City of Milwaukee,* 144 F.3d 1111 (7th Cir.1998); *Stanton v. Republic Bank of S. Chicago*, 144 Ill.2d 472, 581 N.E.2d 678, 682 (1991).  With respect to fraudulent transfers, some courts have awarded prejudgment interest beginning from the time that demand or an adversary proceeding is initiated, while others have awarded prejudgment interest from the date of the transfer.  *See In re First National Parts Exchange, Inc*., No. 98 C 5915, 2000 WL 988177, at *14 (N.D. Ill. July 18, 2000).  Judge Schmetterer granted interest at the average prime rate from the date of the rent transfers, August 28, 1997.  Initial Findings, 360 B.R. at 877-78.

Defendant objects both to the award of prejudgment interest and to the bankruptcy court's use of the transfer date rather than the date the adversary case commenced.  (Def.'s Br. at 71.) Defendant first argues that the bankruptcy court erred in applying federal common law rather than Illinois law in awarding prejudgment interest.  Count IX of Plaintiff's complaint sought to avoid the

HPCH Lease and, in any event, to recover payments made under the HPCH Lease to the extent they exceeded fair market rental value. Initial Findings, 360 B.R. at 875. The bankruptcy court found that the transfers were voidable under the "strong-arm" provision of the Bankruptcy Code, 11 U.S.C. § 544(b).[28] Under that provision, "the trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law . . . ." 11 U.S.C.§ 544(b)(1); *In re Image Worldwide, Ltd.*, 139 F.3d 574, 576-77 (7th Cir.1998). The bankruptcy court looked to state law, the Illinois Uniform Fraudulent Transfer Act ("IUFTA"), 740 ILCS 160/1, *et seq.*, to determine whether the transaction was voidable under Section 544(b)(1), and concluded that Plaintiff had proven a claim under 740 ILCS 160/5(a)(2). But despite its reliance on Illinois law to determine which transfers were voidable, the bankruptcy court nonetheless applied federal common law in deciding whether to grant prejudgment interest, concluding that such a decision was within the court's discretion. Initial Findings, 360 B.R. at 877-78 (citing *Gorenstein Enters., Inc.,* 874 F.2d at 439). Defendant now argues for the first time on appeal that Illinois law, which has stricter criteria for awarding prejudgment interest, should control the awarding of interest because the transfers were voidable under Section 544–as opposed to Section 548–of the Bankruptcy Code.

Plaintiff objects that Defendant waived this argument by failing to raise it below. (Pl.'s Resp. at 69.) While it is true that Defendant did not assert the applicability of Illinois law to the award of prejudgment interest either during trial or in its post-trial brief, Defendant argues convincingly that

---

[28] Transfers avoidable under Section 544(b)(1) are recoverable under Section 550: [T]o the extent that a transfer is avoided under section 544 ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from-

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550.

88

it could not have anticipated the trial court's reliance on federal common law in its Initial Findings and Conclusions of Law. In its post-trial brief, Plaintiff requested prejudgment interest calculated at the average prime rate for the period August 1997 to March 2006, but did not specify the legal basis for its request. (Adversary Case, Dkt. No. 541, 59-61.) Defendant noted in its post-trial brief that "[t]he Bankruptcy Code does not expressly provide for prejudgment interest." Acknowledging that such an award is nevertheless "within the Court's discretion," Defendant urged that any award of prejudgment interest would be inappropriate because Defendant received the transfers innocently. (Adversary Case, Dkt. No. 546. at 109, 110.) There was no post-trial oral argument. At the time Defendant filed its post-trial brief, it could not have known that the court's basis in law for awarding interest, even if its post-trial pleadings anticipate the court's reliance on federal law.

Though the court concludes Defendant preserved this argument, it also overrules the objection to the application of federal common law on this issue. As Defendant notes, the pre-July 1998 payments were outside the one-year "clawback" period of Section 548 of the Bankruptcy Code; thus, Judge Schmetterer's awarded damages were necessarily based on IUFTA, applied via Section 544 of the Code. Defendant argues that the decision to award prejudgment interest was consequently based "solely on state law," and state prejudgment interest law should apply. (Def.'s Br. at 71.) The case law in this Circuit is limited, but existing precedent favors the application of federal common law in awarding prejudgment interest based on state law claims brought pursuant to Section 544(b)(1) of the Bankruptcy Code. For example, *In re Phillips*, 379 B.R. 765, 787-88 (Bankr. N.D. Ill. 2007), filed within days of the parties' appellate briefs, held that the award of prejudgment interest for avoidable transfers under Section 544(b)(1) predicated on 740 ILCS 160/8 was within the court's discretion, even though the Bankruptcy Code did not provide for the award of prejudgment interest. In that case, the trustee neglected even to request prejudgment interest, but the court chose to exercise its discretion on the trustee's behalf, noting the Seventh Circuit's preference for awarding prejudgment interest in federal cases: "[T]he Seventh Circuit Court of

Appeals has recognized that prejudgment interest should be included as a component to compensation for victims of federal law violations." *Id.* (citing *Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 820 (7th Cir. 2002)); *see also Gorenstein Enters., Inc.,* 874 F.2d at 436 ("The time has come, we think, to generalize, and to announce a rule that prejudgment interest should be presumptively available to victims of federal law violations.").

Similarly, the court in *In re Roti*, 271 B.R. 281, 304 (Bankr. N.D. Ill. 2002), not cited on this issue by either party, awarded prejudgment interest for transfers held fraudulent under 740 ILCS § 160/5(a)(1) and § 160/5(a)(2), again exercising the court's discretion under the federal law: "Pursuant to § 544(b)(1), the Trustee may recover those transfers . . . plus prejudgment interest . . . ." *Id.* Finally, *In re Hennings Feed and Crop Care, Inc.*, 365 B.R. 868 (Bankr. C.D. Ill. 2007), cited by Plaintiff, awarded prejudgment interest in a Section 544(b) action predicated on IUFTA, citing only federal law in support. As in the instant case, these courts did not look to state law in awarding damages because the trustees' claims were brought in federal court and alleged violations of federal law. State law merely supplied the criteria to determine whether the transfers were fraudulent and therefore voidable under the applicable state law and Section 544(b).

Defendant's numerous citations fail to persuade the court that state law should control here. Of the cases cited, only one is from Illinois, and it did not involve claims under IUFTA or claims brought pursuant to Section 544(b) of the Bankruptcy Code. *See In re Pearson Indus., Inc.,* 152 B.R. 546 (Bankr. N.D. Ill. 2002). Rather, the trustee in that case sought recovery solely under state corporate law, 815 ILCS 205/2, and ordinary contract law. *Id.* at 560. The only cases that come close to supporting Defendant's argument are two Ninth Circuit opinions, *In re Acequia*, 34 F.3d 800, 818 (9th Cir. 1994), and *In re Agricultural Research and Tech. Group, Inc.*, 916 F.2d 528, 541 (9th Cir. 1990). *In re Acequia* merely quotes *In re Agricultural Research* in a footnote for the proposition that "state law regarding prejudgment interest is applicable via 11 U.S.C. § 544(b)." 34 F.3d at 818 n.4 (quoting *In re Agricultural Research*, 916 F.3d at 531). *In re Agricultural Research*

states, without citation, "Hawaii law regarding prejudgment interest is applicable via 11 U.S.C. § 544(b)."

It is federal law, not state law, that permits a trustee to recover for a voided transfer in bankruptcy. Federal law, accordingly, should govern the magnitude of that recovery. Given the Seventh Circuit's presumption in favor of awarding prejudgment interest as an element of full compensation and the bankruptcy court's wide discretion under the Bankruptcy Code, the bankruptcy court did not clearly err in deciding to award Plaintiff prejudgment interest. *See Shott v. Rush-Presbyterian-St. Luke's Med. Ctr.* 338 F.3d 736, 745 (7th Cir. 2003) ("We note also that there is a presumption in favor of awarding prejudgment interest."), citing *In re Milwaukee Cheese Wis., Inc.,* 112 F.3d 845, 849 (7th Cir.1997) ("[A district court's] [d]iscretion must be exercised according to law, which means that prejudgment interest should be awarded unless there is a sound reason not to do so.")).

In addition, Defendant claims the bankruptcy court erred in calculating prejudgment interest from the date of the fraudulent transfers instead of from the commencement of the adversary case. As noted above, courts have wide discretion in this area, some deciding to award prejudgment interest from the date of the adversary proceeding and others from the date of the transfers. *See In re First National Parts Exchange,* 2000 WL 988177, at *14 (citing cases). Defendant offers no controlling authority for its contention that courts may not award prejudgment interest from the transfer dates absent some showing of blatant fraud or bad faith on the part of Defendant. Further, while there were no allegations of intentional wrongdoing, the bankruptcy court found that Defendant "is clearly a sophisticated creditor that received rent payments far in excess of fair market value." Initial Findings, 360 B.R. at 878. The court holds that the bankruptcy court did not abuse its discretion in awarding prejudgment interest from the dates of the transfers.

## CONCLUSION

For the reasons stated above, the court AFFIRMS the bankruptcy court's Amended Final

Judgment on Counts VIII, IX and X of Plaintiff's Complaint and Final Order Granting Summary Judgment for Plaintiff as to Defendant's proof of claim in the bankruptcy case and Defendant's counterclaim in the adversary proceeding.

ENTER:

Dated: March 17, 2009

_____
REBECCA R. PALLMEYER
United States District Judge